Bob Pemberton, Justice
Federal law requires inter state motor carriers to annually register and pay fees through what is known as the "Unified Carrier Registration" process. Texas law also imposes certain registration, fee, and financial-responsibility requirements on motor carriers as a prerequisite to operating intra state within our state's borders. The dispositive issues in this appeal concern whether an interstate motor carrier's compliance with the Unified Carrier Registration requirements excuses it, by virtue of either federal preemption or Texas law's own internal limitations, from complying with Texas requirements with respect to any intrastate operations it also conducts here. We conclude it does not, at least with respect to the Texas requirements at issue here.
BACKGROUND
At a much earlier juncture, the underlying litigation gave rise to an interlocutory appeal from a jurisdictional challenge that we addressed in Texas Department of Transportation v. Sunset Transportation, Inc. ( Sunset I ).[2] As suggested in our opinion there, one needs an introductory explanation of a complicated regulatory scheme just to understand what the parties' dispute is about.
Regulation of interstate versus intrastate motor-carrier operations
The bedrock of this legal landscape is Congress's constitutionally enumerated power to regulate interstate commerce[3] and the corresponding limitations on state power to discriminate against or unduly burden interstate commerce that this express grant has been held to imply.[4] Under *54 color of this authority, Congress has enacted statutes regulating motor-carrier operations in interstate commerce,[5] including requiring such carriers to register for and obtain what is termed federal "operating authority" from the Department of Transportation (specifically, the Federal Motor Carrier Safety Administration) as a prerequisite to market entry.[6] This registration process, in turn, requires compliance with various additional prerequisites that include registering for and obtaining a "USDOT number" from the Department,[7] filing with the Department the designation of an agent for service of process in each state through which the carrier operates,[8] and providing proof of financial responsibility of a nature and minimum amount the Department prescribes.[9]
The Texas Legislature has similarly enacted regulatory statutes that apply to motor-carrier operations within this state. These enactments include Chapter 643 of the Texas Transportation Code,[10] which imposes, as a prerequisite to operating a commercial motor vehicle on "a road or highway of this state," a regime of registration and filing requirements that is currently administered by the Texas Department of Motor Vehicles (TDMV).[11] To *55 obtain this Texas state version of operating authority, Chapter 643 requires a motor carrier to, inter alia , file an application providing its name, address, agent for service of process (if different), and a description of each motor vehicle requiring registration, accompanied by a $100 "application fee" plus a $10 fee for each vehicle.[12] The registrant must also file proof of insurance[13] for each vehicle, in an amount set by TDMV that cannot exceed the amounts prescribed in the counterpart federal requirements, accompanied by an additional filing fee.[14] Assuming the registration is approved by TDMV, the agency issues a registration certificate and, for each vehicle, a "cab card" that must be carried onboard.[15]
Of particular importance for this case, Chapter 643 generally requires that a motor carrier's state operating authority must be renewed periodically, typically on an annual basis.[16] The process for renewing a motor carrier's state operating authority generally entails payment of a registration renewal fee and providing evidence of continuing insurance.[17] In addition to requiring proof of insurance in connection with an initial or renewal registration, Chapter 643 requires a motor carrier to make such a filing if it fails to maintain registration and has to register anew, or if it changes ownership or insurers.[18]
The TDMV has implemented these and related statutory requirements through rules now codified in Subchapter B of Title 43, Chapter 218 of the Texas Administrative Code.[19] Specific provisions of significance to this case include:
• Rule 218.11, which forbids a motor carrier from operating upon the public roads or highways of this state without first obtaining a certificate of registration issued by TDMV.[20]
• Rule 218.13, which specifies the content of the registration application and requires it be accompanied by an application fee, proof of insurance in accordance with Rule 218.16, and an "insurance filing fee" of $100.[21] Rule 218.13 also prescribes the duration of said registration, which generally may be only for specified periods that include one or 22 two years.[22]
• Rule 218.14, which permits and prescribes procedures for renewals of annual or biannual registrations. These requirements include the filing of a renewal application, a filing fee, and a requirement that the "motor carrier shall maintain continuous insurance ... in an amount at least equal to the *56 amount prescribed under [Rule] 218.16."[23]
• Rule 218.16, which prescribes minimum insurance requirements and requires that the motor carrier "file and maintain" proof of automobile liability insurance for all vehicles required to be registered "at all times."[24] The rule further specifies that such filing is actually performed by the motor carrier's insurance carrier, and must be performed, at the time of original application for registration and upon any of several subsequent events bearing on coverage, including any change in insurers or any replacement of an active insurance filing.[25]
Of final note, Chapter 643 and TDMV's rules authorize the agency to revoke a motor carrier's state registration on grounds that include failure to maintain the required insurance.[26] In that event, a motor carrier has resort to a contested-case hearing process to oppose the action.[27] If a registration is revoked, the motor carrier may retain its prior certificate of registration number by filing a "supplemental" application to "re-register" in lieu of a new original application, together with "adequate evidence that [it] has satisfactorily resolved the facts that gave rise to the ... revocation."[28] But the supplemental application must be accompanied by a new filing of proof of insurance and a $100 insurance-filing fee.[29]
The parties agree that, for purposes of our analysis here, the federal registration regime applies to motor carriers that operate in interstate commerce ("interstate motor carriers"), while motor carriers that operate intrastate within Texas would be subject to the Texas regime. Their dispute arises in an area of overlap between the two regimes-interstate motors carriers who also operate intrastate in Texas. More specifically, the dispute concerns the ramifications of an additional layer of the federal regulatory regime applicable to interstate motor carriers-the Unified Carrier Registration Act of 2005 (UCR Act)[30] -and the extent to which the UCR Act limits the authority Texas otherwise would exercise over the Texas intrastate operations of interstate motor carriers.
The UCR Act
The UCR Act is best understood against a historical backdrop of federal measures that had authorized states to require (or more precisely, provided that states would not be considered to unduly or unreasonably burden interstate commerce by requiring) proof of the federal operating authority of an interstate motor carrier that operates through the states' respective boundaries.[31] Initially, the federal government *57 permitted these state laws to take the form of annual registration requirements with accompanying fees of up to $10 per vehicle, per year.[32] Such requirements were to be administered by each participating state individually, meaning that interstate motor carriers were required to register and pay fees annually to each separate state through which their vehicles might pass during the ensuing year. To verify compliance, carriers would be issued a state-specific stamp that they would then affix to a multistate "cab card" (a/k/a "bingo card") that had to be carried within the vehicle.[33]
Over time, Texas and thirty-eight other states came to impose these registration and fee requirements, giving rise to complaints that state-by-state compliance under the "bingo card" system had grown too burdensome for interstate motor carriers.[34] Acting on such concerns, Congress in the 1990s enacted legislation establishing a new "Single State Registration System," whereby an interstate motor carrier was deemed to have complied with the registration requirements of all of the participating states through which it operated if the carrier registered in a single "base State" and paid that state a total fee representing the sum of the individual states' fees, which the base state would then disburse among the relevant participating states according to their respective shares.[35] In lieu of the "bingo card" and multiple state stamps of the prior regime, compliance was signified by a mere receipt that was kept in the vehicle.[36] However, Congress authorized the base state to demand proof of (1) the carrier's federal operating authority, (2) compliance with federal financial-responsibility requirements, and (3) the carrier's agents for service of process required by federal law.[37]
Eventually, Congress saw fit to revisit this balancing of interests yet again through the UCR Act. In that Act, Congress abolished the Single-State Registration System and declared it to be an unreasonable burden on interstate commerce for any state, its subdivisions, or combination of states "to enact, impose, or enforce any ... standards with respect to, or levy any fee or charge on," any interstate motor carrier in connection with state registration of the carrier's interstate operations, state filings of information relating to federal financial responsibility, or state filings of the federally required agents for service of process.[38] The Act instead contemplated that states, other governmental entities, and private persons would verify interstate motor carriers' federal compliance through an online "Unified Carrier Registration System" that is to consolidate federal motor carrier registrations, federal financial-responsibility filings, federal *58 agent-of-process filings, and other information regarding interstate motor carriers.[39]
A vestige of the earlier regimes lives on under the UCR, however, in the form of a more limited form of registration (essentially, completing a one-page form providing name, address, and USDOT and federal registration numbers) that interstate motor carriers must perform annually in a base state. The Act also authorizes imposition of fees that serve to replicate or replace somewhat the fee revenues made available to states under the prior regimes.[40] However, in lieu of the state-specific focus of the earlier fees, the UCR fees are calculated as flat nationwide rates according to the size of the carrier's vehicle fleet.[41] While all states are subject to the Act's preemptive provisions, individual states are given the choice of participating as base states and sharing fee revenues under an interstate agreement (known as the "UCR Agreement").[42]
A more critical feature of the UCR Act for this appeal, however, is that Congress also expressly preempted two categories of state requirements relating to the intrastate operations of interstate motor carriers.[43] First, states are barred from imposing any fee or tax on interstate motor carriers that also operate intrastate if carriers that operate exclusively intrastate there would be exempt from that exaction.[44] Second, with respect to intrastate motor carrier operations other than charter-bus service, household-goods transport, certain tow-truck operations, and waste transport,[45] states cannot:
enact, impose, or enforce any requirement or standards with respect to, or levy any fee or charge on, any [interstate] motor carrier ... in connection with-
...
the annual renewal of the intrastate authority, or the insurance filings, of the motor carrier ..., or other intrastate filing requirement [defined elsewhere in the UCR Act to mean "any fee, tax, or other type of assessment, including per vehicle fees and gross receipts taxes, imposed on a motor carrier ...for the renewal of the intrastate authority or insurance filings of such carrier with a State"[46] ] necessary to operate within the State.[47]
But this second preemptive provision is conditioned on the interstate motor carrier being:
(1) registered under federal law (i.e., having federal operating authority), which the Act contemplates would eventually be performed through the UCR system; and
(2) "in compliance with the laws and regulations of the State authorizing the carrier to operate in the State *59 in accordance with section 14501(c)(2)(A)[.]"[48]
The "section 14501(c)(2)(A)" referenced in the latter provision had previously been enacted by Congress as a component of the Federal Aviation Administration Authorization Act of 1994 (FAAA Act).[49] Under that Act, in aid of federal deregulation of interstate trucking,[50] Congress prescribed a "[g]eneral rule"-now codified within Section 14501, Subsection (c) of Title 49, United States Code[51] -that states, their subdivisions, or combinations of states "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier ... with respect to the transportation of property."[52] But Congress excepted from this "[g]eneral rule" certain categories of intrastate transportation and related state regulations, including the following exception that is enumerated in the aforementioned Section 14501(c)(2)(A) :
the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous weight of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.[53]
The UCR Act has been construed and applied in the UCR Agreement itself,[54] as well as through "Informal Guidance " issued periodically by the UCR Plan Board of Directors.[55] In the view of these authorities, the key preemptive effects of the Act can be summarized as follows:
*60 • States are barred from requiring interstate motor carriers to file proof of their compliance with federal requirements relating to interstate operating authority, financial responsibility requirements, or agents for service of process.[56]
• Conversely, state regulation of motor carriers that operate only in intrastate transportation is not affected.[57]
• Where UCR-registered interstate motor carriers also operate intrastate, the UCR Act distinguishes between (1) "initial" registration filings, insurance filings, and related fees required for obtaining intrastate operating authority within a particular state, which can permissibly be imposed on UCR registrants with respect to their intrastate operations there,[58] versus (2) the imposition of such filing or fee requirements when made necessary to "renew" intrastate operating authority, which is prohibited.[59]
• However, "[a] State may require the insurance company or surety company providing such coverage to notify the State whenever the coverage is cancelled or not renewed," and "nothing in the UCR Act prohibits a State from verifying the coverage as part of its internal review process of intrastate motor carriers."[60] Additionally, with reference to the underlying substantive requirements of insurance or financial *61 responsibility, "a State may enforce its laws requiring liability coverage for any vehicle operating on the State's public ways. In other words, if an interstate motor carrier is found to be operating on a State's highways without liability insurance coverage, the State may take an action against that motor carrier."[61]
The parties generally agree with this basic view of the UCR Act's material features, though they differ vigorously as to the implications for Texas's regulatory scheme.
Texas's response to UCR
Texas, which had also participated in the former Single-State system, opted into the UCR Agreement through legislation that took effect on September 1, 2007.[62] A corresponding rule adopted in response to the UCR Act, Section 218.17 of Title 43, provided that the State, through TDMV, shall participate in the UCR system plan and agreement, and would later adopt by reference the UCR Agreement.[63] Rule 218.17 further required that an interstate motor carrier operating in Texas must register and comply with the UCR system.[64]
Other changes were calculated to take account of the UCR Act's preemption provisions. The Legislature amended a preexisting provision of Chapter 643 that had addressed the effects of the former Single-State system, Section 643.002, to read (with the new language italicized):
This chapter [643] does not apply to:
(1) motor carrier operations exempt from registration by the Unified Carrier Registration Act of 2005 ( 49 U.S.C. Section 14504a ) or a motor vehicle registered under the single state registration system established under 49 U.S.C. Section 14504(c) when operating exclusively in interstate or international commerce[.][65]
A corresponding rule amendment exempted "a motor vehicle exempt from registration by the Unified Carrier Registration Act of 2005" from the definition of "[c]ommercial motor vehicle" made subject to the registration requirements implemented under Chapter 643.[66]
Further, a new Subsection (c) of Rule 218.14 provided that "[a]n interstate motor carrier registered under § 218.17" (i.e., UCR) "is not required to renew a certificate of registration issued under § 218.11."[67] Correspondingly, TDMV created, initially as a practice or policy, but eventually through formal rules, a "non-expiring" form of registration certificate *62 that would be issued to a UCR-compliant interstate motor carrier upon the carrier's notification of that status to TDMV.[68]
However, Subsection (c) of Rule 218.14 also contemplated that this "non-expiring" form of registration could still be lost through revocation, as with other types of registration. Subsection (c)(2) cautioned that "[i]f a motor carrier that registered under § 218.17 [i.e., UCR] does not maintain continuous motor carrier registration under § 218.11," it would be required to re-register or otherwise regain registration (with the accompanying required fees and insurance filings that process entailed) in order to operate intrastate within Texas.[69]
The dispute
The two appellants-Sunset Transportation, Inc., and MEL Transport, Inc.-are affiliated interstate motor carriers that at all relevant times have each been registered in compliance with UCR. Each carrier had also previously obtained Texas intrastate operating authority from TDMV. In June 2008, however, TDMV gave notice to Sunset that its intrastate operating authority was being revoked for failure to maintain the insurance required by Chapter 643 and TDMV rules, more specifically that the Texas Department of Insurance had determined that Sunset's insurer-MAKE Transportation, Inc., a risk-retention group affiliated with Sunset and MEL-had exceeded a maximum aggregate net risk after reinsurance.[70] Sunset did not avail itself of the remedies for challenging the action, and it became final. There is also evidence that MEL's intrastate operating authority was similarly revoked for failure to maintain the required financial responsibility-on at least two occasions-although appellants insist that MEL thereafter made the filings and fee payments necessary to regain that authority.
While appellants have not preserved any direct challenges to the revocations, they have mounted a broader attack on TDMV's power to enforce its requirements relating to interstate operating authority against a UCR-compliant interstate motor carrier. Essentially appellants' position is that once an interstate motor carrier then also having Texas intrastate operating authority registers under UCR, as did they, any subsequent enforcement of Texas's requirements for maintaining that authority, such as insurance requirements, runs afoul of the UCR Act's preemption of "renewals" or "annual filings," or alternatively of Texas law's internal limitations deriving from Section 643.002 of the Transportation Code. Premised on these contentions, appellants in their live pleadings asserted claims under Section 2001.038 of the Administrative Procedure Act (APA) for declarations invalidating Rule 218.14(c)(2) (the provision contemplating that a UCR-compliant interstate motor carrier could be required to re-register, with attendant fee and insurance-filing requirements, upon revocation of its "non-expiring" intrastate authority[71] ) and Rule 218.16(e)(1)(A) (the general requirement-and potential ground for revocation-that "[a] motor carrier shall file and maintain proof of *63 automobile liability insurance for all vehicles required to be registered ... at all times"[72] ), as well as a declaration that TDMV's rules governing registration of intrastate motor-carrier operations (Chapter 218 of Title 43) were wholly inapplicable to them.[73] To similar effect, appellants asserted a litany of claims through the Uniform Declaratory Judgments Act (UDJA),[74] with an accompanying claim for the attorney's fees that the statute would permit,[75] that in essence sought to restrain TDMV's enforcement and administration of this regime as conduct ultra vires of statutory or (with reference to federal preemption and the Supremacy Clause) constitutional authority.[76]
The proceedings below were ultimately concluded with a bench trial in which both jurisdictional challenges and the merits were addressed. After hearing evidence, the district court rendered final judgment on the merits-thereby implicitly overruling appellees' jurisdictional challenges-and ordered that appellants take nothing on their claims. The district court subsequently made findings of fact and conclusions of law. Among these, the district court found that both Sunset and MEL had their intrastate authority revoked for failing to maintain insurance or proof of financial responsibility and that TDMV and its rules had not run afoul of UCR preemption or Transportation Code Section 643.002 either legally or factually.
Appellants timely perfected an appeal from the district court's final judgment.
ANALYSIS
Appellants bring what are styled as seven issues on appeal seeking reversal of the district court's judgment and rendition of judgment on their claims, or alternatively, a new trial. These issues ultimately distill to five basic legal contentions. In appellants' view, the UCR Act preempts, with respect to the intrastate operations of UCR-compliant interstate motor carriers that had previously obtained Texas intrastate operating authority, (1) Texas's minimum insurance requirements; (2) any required re-registration and accompanying insurance filings or fee payments in the event intrastate authority is revoked; (3) Rule 218.16(e)(1)(A)'s requirement that motor carriers "file and maintain" proof of automobile liability insurance for all vehicles required to be registered "at all times";[77] and (4) Rule 218.14(c)(2)'s provision contemplating that UCR-compliant interstate motor carriers with Texas intrastate authority can have that authority revoked for noncompliance with insurance or insurance-filing requirements.[78] Alternatively, appellants urge that (5) Texas law, *64 chiefly Section 643.002(1) of the Transportation Code, exempts the intrastate operations of UCR-compliant interstate motor carriers from the registration regime otherwise imposed under Chapter 643 and TDMV rules.[79]
In addition to opposing appellants' positions on the merits, appellees seek reversal of the district court's judgment to the extent of dismissing appellants' claims under the UDJA as barred by sovereign immunity,[80] arguing specifically that appellants have not proven any conduct ultra vires of appellees' statutory or constitutional powers and also seek UDJA relief redundant of appellants' APA claims.[81] Although we are obligated to consider these jurisdictional challenges,[82] the stakes are largely theoretical here, as these challenges parallel the merits of appellants' claims and appellants disclaim any claim for UDJA attorney's fees at this juncture. Accordingly, we will focus initially on the controlling legal questions raised by appellants, then sort out how our answers implicate jurisdiction versus the merits.
Preemption
General principles
The Supremacy Clause of the United States Constitution gives Congress the power to preempt state law.[83] There *65 are three well-known categories of federal preemption-"express," "field," and "conflict" preemption.[84] Where, as here, a federal statute expressly preempts state law, "our analysis of the scope of the pre-emption statute must begin with its text[.]"[85] "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case.'"[86] We "begin with a presumption that Congress did not preempt state law."[87] This presumption "applies not only to whether Congress preempted state law at all, but also to the scope of preemption."[88] Moreover, this "presumption is particularly strong when Congress legislates 'in [a] field which the States have traditionally occupied.' "[89] "[W]e 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' "[90] *66 Moreover, "[c]itizens' health and safety are 'primarily and historically, ... matter[s] of local concern,' and thus states have 'great latitude' to protect 'the lives, limbs, health, comfort, and quiet of all persons.' "[91]
Appellants acknowledge that the UCR Act permits states to require registration, proof of insurance, and related fee requirements on UCR-compliant interstate motor carriers as a condition for initially obtaining intrastate authority. Their focus, rather, is on Texas law requirements that may come into play after such carriers obtain their intrastate authority.
Insurance requirements
Appellants insist that the UCR Act preempts TDMV from requiring UCR-compliant interstate motor carriers to comply with Texas's minimum-insurance requirements with respect to their intrastate operations here. Relatedly, appellants urge that the UCR Act preempts TDMV from requiring compliance with these insurance requirements as a condition for maintaining intrastate operating authority, as contemplated by Rule 218.14(c)(2). As appellants see it, the UCR Act had the effect of requiring UCR-compliant interstate motor carriers, once having initially obtained intrastate operating authority in a state, to comply only with the federal insurance requirements made a condition of the federal operating authority, with no obligation to continue complying with any counterpart state insurance or financial responsibility requirements made a condition of intrastate operating authority within that state. In this regard, appellants assert (and appellees do not appear to dispute) that the federally required insurance for interstate motor carriers, which they claim to have had in effect at all relevant times, has higher minimums than Texas's counterpart requirements. In fact, as previously noted, Chapter 643 caps the insurance minimums TDMV is authorized to set at the amounts prescribed in the counterpart federal requirements.[92]
To the extent appellants are complaining that TDMV erred in determining they each lacked insurance complying with the Texas requirements and revoking their intrastate authority on that basis, they have, again, failed to preserve that contention.[93]
*67 And the text of the UCR Act belies appellants' view that UCR compliance excuses them from ongoing compliance with the Texas insurance requirements.
As explained previously, the UCR Act preempts two categories of state regulatory activity relating to interstate motor carriers that also operate intrastate: (1) a state is barred from imposing any fee or tax on such interstate motor carriers if intrastate-only carriers there would be exempt from that exaction;[94] and (2) a state cannot (with the exception of charter-bus service, household-goods transport, certain tow-truck operations, and waste transport) "enact, impose, or enforce any requirement or standards with respect to, or levy any fee or charge on, any [interstate] motor carrier ... in connection with ... the annual renewal of the intrastate authority, or the insurance filings, of the motor carrier ..., or other intrastate filing requirement necessary to operate within the State."[95] Appellants ground their arguments in the second category of preempted state activity, insisting that TDMV is imposing a form of prohibited "annual renewal" of their intrastate operating authority. But this second category is expressly conditioned on the interstate motor carrier meeting requirements that include being "in compliance with the laws and regulations of the State authorizing the carrier to operate in the State in accordance with section 14501(c)(2)(A) [.]"[96] And " section 14501(c)(2)(A)," again, refers to "the safety regulatory authority of a State with respect to motor vehicles, ... or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization [.]"[97] Among the effects of this language and statutory structure is that TDMV is not preempted from enforcing Texas's insurance requirements with respect to the intrastate operations of UCR-registered interstate motor carriers.[98] Our *68 conclusion is further supported by the presumption against preempting "the historic police powers of the States ... unless that [is] the clear and manifest purpose of Congress."[99] We overrule appellants' contentions to the contrary.
"Re-registration" following revocation
For essentially the same reasons, we likewise reject assertions by appellants that the UCR Act preempts TDMV from requiring them, following revocation of their intrastate operating authority for noncompliance with Texas's minimum-insurance requirements, to submit applications, insurance filings, and related fees in order to regain their authority. As just explained, the UCR Act's preemption of "annual renewals" related to intrastate authority is conditioned on, among other requirements, a carrier being "in compliance with the laws and regulations of the State authorizing the carrier to operate in the State in accordance with section 14501(c)(2)(A),"[100] i.e., "the safety regulatory authority of a State with respect to motor vehicles, ... or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization[.]"[101] Consequently, because appellants were each found out of compliance with Texas's insurance and financial-responsibility requirements and did not preserve any challenge to those determinations, the UCR Act did not preempt TDMV from requiring appellants to "re-register" in order to regain their intrastate operating authority.
Insurance filings
Appellants further complain that TDMV is transgressing the UCR Act's preemptive scope by requiring "annual renewal[s] of ... insurance filings" (as distinguished from compliance with substantive coverage requirements) by UCR-compliant interstate motor carriers as a condition of retaining the intrastate operating authority.[102] In part, this is an attempt by appellants to leverage one of our holdings from Sunset I. In that earlier opinion, we held-in the context of a jurisdictional challenge to the sufficiency of appellants' pleadings at the time-that appellants had pleaded facts that would be ultra vires of TDMV's authority vis-à-vis UCR preemption.[103] Our analysis rested on unchallenged factual allegations that, liberally construed as per our standard of review there, had asserted that the agency was baldly requiring UCR-compliant interstate motor carriers "whose registrations have not been revoked to re-register, pay related fees, and also submit annual filings of proof of financial *69 responsibility."[104] Suffice it to say that the procedural posture of the present appeal is quite different-a final judgment following a bench trial at which appellees contested appellants' allegations both factually and legally. In short, the Sunset I holdings that appellants emphasize are ultimately of little guidance or import in the present appeal.
As their contentions have been refined through the intervening proceedings, appellants specifically complain of Rule 218.16 (e)(1)(A)'s requirement that motor carriers "file and maintain proof of automobile liability insurance for all vehicles required to be registered ... at all times. "[105] Together with the prospect of revocation of intrastate authority for noncompliance, as contemplated by Rule 218.14(c)(2), Rule 218.16(e)(1)(A), appellants reason, amounts to a preempted required "annual renewal of ... the insurance filings, of the motor carrier" as a condition of retaining intrastate authority.[106] As an initial observation, we question whether appellants have standing to assert this challenge on this record,[107] given the district court's findings that the intrastate operating authority of both carriers had been revoked.[108] Under these findings, neither carrier would have a ripe or live claim that it was being required to make "annual" insurance filings despite having active intrastate authority, as appellants have alleged.
Appellants further suggest that MEL, at least, would possess a justiciable interest in the claim by virtue of current or imminent re-registration. Even if so, we cannot conclude that the district court erred in rejecting the claim on its merits.
Reading Rule 218.16 as a whole, the complained-of obligation to "file" or "maintain" proof of insurance (which, as an aside, is actually performed by the motor carrier's insurer[109] ) arises upon three types of events:
• "[A]t the time of the original application for motor carrier certificate of registration" (i.e., intrastate authority.[110] This filing must be accompanied by a $100 "filing fee."[111]
• When a motor carrier asks to retain the certificate number of a previously revoked certificate of registration.[112] This filing must also be accompanied by the $100 "filing fee."[113]
• Several specified events in the nature of updating the insurance filing, for which no filing fee is required.[114]
• When the motor carrier changes insurers.[115]
*70 • When the motor carrier changes its name.[116]
• When the motor carrier changes the classification of cargo it transports.[117]
• On or before the cancellation date of insurance coverage indicated in a 30-day advance notice the insurer is generally required to provide TDMV before cancelling coverage.[118]
• "[W]hen replacing another active insurance filing," in which event TDMV "will consider [the] new insurance filing as the current record of financial responsibility required by this section" upon receipt and if no cancellation notice has been received for previous insurance filings.[119]
TDMV also presented evidence-specifically, the testimony of Angel Oliver, manager of its credentialing section-to elaborate on the workings of these rules in practice. Mr. Oliver explained that the required filings are submitted by the insurer or underwriter electronically through what is known as a "Form E." Once made, according to Oliver, the same Form E "stays in place" or remains effective for however long the motor carrier continues to pay premiums and keeps its coverage in effect with the same insurer. In this regard, Oliver observed that "we [TDMV] have carriers that have filed a Form E 10 years ago, and we never hear from them again because they continue to have the same insurance provider as when they began operations." If, on the other hand, the motor carrier "chooses to go shopping for a better rate or whatever" with a different insurer, Oliver acknowledged, the new insurer would then be required to file a Form E.
Consistent with this testimony (and indeed also the text of the rules), the district court found that TDMV "does not charge intrastate motor carriers an annual insurance charge or require the motor carrier to annually submit insurance filings," and that TDMV "does not require a motor carrier with interstate operations that was also registered with [TDMV] whose registration[ ] had not been revoked to ... submit annual filings of proof of financial responsibility." We do not understand appellants to assail the evidentiary support underlying these findings. Rather, appellants' arguments for reversal based on insurance-filing requirements ultimately boil down to the legal propositions that either (1) the required updating of a Form E filing upon a material change in coverage, or (2) the required insurance filing and fee incident to re-registration following revocation of intrastate authority, amount to the sort of "requirement or standards with respect to ... the annual renewal of ... the insurance filings, of the motor carrier ... necessary to operate within the State" that the UCR Act preempts.[120] Neither proposition is viable, as neither requirement can be said to be either "annual" in nature, nor a "renewal." Instead, the term "annual renewal" as used in the UCR Act would denote a recurring renewal required by the state, in contrast with the insurance-filing requirements at issue here, whose application is ultimately controlled by the motor carriers' own actions. The plain meaning of this term, as well as the presumption against preemption,[121] leads *71 us to conclude that the insurance-filing requirements at issue here are not preempted by the UCR Act.
Texas law limitations
Appellants' alternative reliance on Texas law is grounded primarily in Transportation Code Section 643.002(1)'s proviso that "[t]his chapter [643] does not apply to ... motor carrier operations exempt from registration by the Unified Carrier Registration Act of 2005 ( 49 U.S.C. Section 14504a )."[122] Appellants' reasoning is twofold. First, they emphasize the Legislature's use of the phrase "motor carrier operations " in the provision, which they contrast with the use of "a motor vehicle registered under the single state registration system" in the pre-UCR portions of the statute.[123] This text, appellants reason, denotes broad categories of "motor carrier operations ," not merely the status or attributes of individual vehicles. Second, appellants deduce that the "motor carrier operations" that are "exempt from registration by the [UCR] Act" refers to the types of intrastate operations of UCR-registered interstate motor carriers to which UCR Act preemption of "annual renewals" can apply, as distinguished from the charter-bus service, household-goods transport, tow-truck operations, and waste transport that Congress has carved out of the preemption.[124] Because its Texas intrastate operations do not involve any of these four non-preempted categories, appellants conclude, those operations are "exempt from registration by the [UCR] Act" within the meaning of Section 643.002(1) and, in turn, not subject to Chapter 643's requirements.
While not appearing to dispute that "registration" denotes that required by Chapter 643 or that "motor carrier operations" are distinguished from individual or particular vehicles, appellees urge that Section 643.002(1)'s "motor carrier operations exempt from registration by the [UCR] Act" instead refers to the Act's prohibitions against state-required registration regarding an interstate motor carrier's interstate operations.[125] Appellees add that a motor carrier's intrastate operations, even those of a UCR-compliant interstate motor carrier not engaged in charter-bus service, household-goods transport, tow-truck operations, or waste transport, are not "exempt from registration by the [UCR] Act," but that the Act instead expressly contemplates application of state registration or "other intrastate filing requirement[s] necessary to operate within the State," with only "annual renewals" and related fees preempted.[126] In essence, appellees maintain that Section 643.002(1)'s exemption for "motor carrier operations exempt from registration by the [UCR] Act" is merely parallel to the preexisting exclusion addressed to vehicles registered under the former single-state system "when operating exclusively in interstate *72 or international commerce,"[127] and does not in itself divest Texas of its regulatory authority over interstate motor carriers' intrastate operations.
Appellants' proposed construction of Section 643.002(1) is not viable.[128] As appellees point out, an interstate motor carrier's intrastate operations, including those other than charter-bus service, household-goods transport, tow-truck operations, or waste transport, cannot be said to be "exempted" from (i.e., freed from obligation or duty)[129] from state registration requirements "by" (i.e., through means of)[130] the UCR Act, and certainly not in the categorical manner appellants urge. On the contrary, the UCR Act explicitly contemplates that states can impose "intrastate filing requirement[s] necessary to operate within the State," at least as an initial matter. And while the UCR Act expressly preempts state-required "annual renewals" of this authority, even this restriction on state power is conditioned on, among other things, a motor carrier being "in compliance with the laws and regulations of the State authorizing the carrier to operate in the State" that are in accordance with "the safety regulatory authority of a State with respect to motor vehicles" or "the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization[.]"[131] This is hardly an "exemption" of an interstate motor carrier's intrastate operations from Chapter 643-required registration.
The most that could be said in support of appellants' proposed construction is that Section 643.002(1)'s "motor carrier operations exempt from registration by the [UCR] Act" could conceivably be read to reference, in addition to interstate operations, intrastate operations that are subjected to prohibited "annual renewals," essentially making Section 643.002's exemption coextensive with the Act's preemptive scope. But this would merely return us to the questions regarding the UCR Act that we have already answered adversely to appellants.
Aside from their misplaced reliance on Section 643.002(1), appellants also insist that TDMV's own rules exempt it from complying with Texas's registration regime for intrastate motor-carrier operations. They refer us to rules requiring that interstate motor carriers operating intrastate in Texas must register and comply *73 with the UCR system,[132] as well as Rule 218.14's provision that UCR-registered interstate motor carriers (aside from those in the non-preempted exceptions) are "not required to renew a certificate of registration."[133] These observations ultimately return us to the same challenges to other rules that we have already rejected.
CONCLUSION
In light of our foregoing holdings, we dismiss appellants' UDJA claims for want of subject-matter jurisdiction (and would, in any event, affirm the district court's judgment that appellants take nothing on these claims). We affirm the district court's judgment that appellants take nothing on their claims under APA Section 2001.038.
Dismissed for Want of Jurisdiction in part; Affirmed in part

357 S.W.3d 691 (Tex. App.-Austin 2011, no pet.).

See U.S. Const. art. I, § 8, cl. 3 ("The Congress shall have Power ... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]").

The United States Supreme Court:
[H]as adopted what amounts to a two-tiered approach to analyzing state economic regulation under the Commerce Clause. When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. We have also recognized that there is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the ... balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity.
Brown-Forman Distillers Corp. v. New York State Liquor Auth. , 476 U.S. 573, 578-79, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) (internal citations omitted).

See 49 U.S.C. § 13501(1)(A) (defining jurisdiction of Secretary of Transportation and Surface Transportation Board as extending, in part, "over transportation by motor carrier and the procurement of that transportation, to the extent that ... property ... [is] transported by motor carrier ... between a place in ... a State and a place in another State"); see also ion index="5" url="https://cite.case.law/citations/?q=49%20U.S.C.%20%C2%A7%2013501">id. § 13102(14) (" 'motor carrier' " defined as "a person providing motor vehicle transportation for compensation").

See id. § 13901.

See id. §§ 13902(a)(1)(B), 31134(a).

See id. § 13304(a).

See id. §§ 13902(a)(1)(A)(vi), 13906(a), 31139.

Tex. Transp. Code §§ 643.001 -.156, .251-.256. In the absence of material intervening substantive amendment, we cite the current version of Chapter 643 and related rules for convenience.

See id. § 643.001(1) ("Department" as used in the chapter refers to the TDMV); id. § 643.051(a) ("A motor carrier may not operate a commercial motor vehicle ... on a road or highway of this state unless the carrier registers with the department under this subchapter."). Prior to November 1, 2009, this authority was vested in the Texas Department of Transportation. See Sunset I , 357 S.W.3d at 698 n.5 (citing Act of May 23, 2009, 81st Leg., R.S., ch. 933, §§ 1.01-11.01, 2009 Tex. Gen. Laws 2485-522); see also itation index="14" url="https://cite.case.law/citations/?q=2009%20Tex.%20Gen.%20Laws%202485">id. (referring to TxDOT for convenience as the relevant agency). As reflected in Sunset I , the parties' dispute and ensuing litigation originated during TxDOT's administration of the regime, with appellants initially asserting claims against TxDOT and its director in his official capacity. See itation index="15" url="https://cite.case.law/citations/?q=2009%20Tex.%20Gen.%20Laws%202485">id. Upon transition of regulatory authority to TDMV, appellants amended their pleadings to add that agency and its director, in her official capacity, as additional defendants, see itation index="16" url="https://cite.case.law/citations/?q=2009%20Tex.%20Gen.%20Laws%202485">id. , but also retained the TxDOT defendants in an abundance of caution. To the extent the distinction has any substantive significance, the TDMV and its director would appear to be the proper parties in interest at this juncture. See itation index="17" url="https://cite.case.law/citations/?q=2009%20Tex.%20Gen.%20Laws%202485">id. ("The Legislature provided that, effective November 1, 2009, 'all powers, duties, obligations, and rights of action of the Motor Vehicle Division ... of the Texas Department of Transportation are transferred to the Texas Department of Motor Vehicles' and that 'the [TDMV] shall continue in any proceeding involving the Motor Vehicle Division, the Vehicle Titles and Registration Division, or the portion of the Motor Carrier Division ... that was brought before the effective date of this act.' " (quoting Act of May 23, 2009, 81st Leg., R.S., ch. 933, § 6.01(a), (d), 2009 Tex. Gen. Laws 2519-20)). We will thus refer to the relevant state actors solely as the TDMV and its director.

See Tex. Transp. Code §§ 643.052(1) -(3), .053(1).

Which may also be satisfied through self-insurance, but only requirements relating to insurance are immediately relevant to this case.

See id. §§ 643.053(2), (3), .101.-103.

See id. §§ 643.054, .059.

See id. §§ 643.058, .061.

See id. § 643.058.

See id. § 643.103.

See generally 43 Tex. Admin. Code §§ 218.10 -.18 (Texas Dep't of Motor Vehicles, Motor Carrier Registration). The prior TxDOT counterpart rules were codified in Chapter 18 of Title 43. We referred to both versions in Sunset I. See 357 S.W.3d at 696-97, 704-05.

See ids="8160976" index="26" url="https://cite.case.law/sw3d/279/608/#p611">id. § 218.11(a) (Texas Dep't of Motor Vehicles, Motor Carrier Registration).

See id. § 218.13(a)(12)(A), (a)(12)(C) (Texas Dep't of Motor Vehicles, Application for Motor Carrier Registration); see id. § 218.16(e)(3) (Texas Dep't of Motor Vehicles, Insurance Requirements) (amount of insurance filing fee).

See id. § 218.13(a)(11).

Id. § 218.14(a), (b) (Texas Dep't of Motor Vehicles, Expiration and Renewal of Commercial Motor Vehicle Registration).

Id. § 218.16(e)(1)(A).

Id. § 218.16(e)(2).

See Tex. Transp. Code § 643.252(a)(1) ; 43 Tex. Admin. Code § 218.72(a) (Texas Dep't of Motor Vehicles, Administrative Sanctions).

See Tex. Transp. Code § 643.2525 ; 43 Tex. Admin. Code § 218.73 (Texas Dep't of Motor Vehicles, Administrative Proceedings).

Id. § 218.13(e)(7).

See id. § 218.16(e)(2)(D), (e)(3).

Pub. L. No. 109-59, §§ 4301-4308, 119 Stat. 1144, 1761-74 (2005) (codified as amended at 49 U.S.C. §§ 13902, 13905-06, 13908, 14504a, 14506 ). The UCR Act is a component (specifically, Title IV-Motor Carrier Safety, subtitle C) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), Pub. L. No. 109-59, 119 Stat. 1144 (2005).

See generally Mid-Con Freight Sys., Inc. v. Michigan Pub. Servs. Comm'n , 545 U.S. 440, 442-43, 125 S.Ct. 2427, 162 L.Ed.2d 418 (2005) (summarizing this history); Yellow Transp., Inc. v. Michigan , 537 U.S. 36, 39-40, 123 S.Ct. 371, 154 L.Ed.2d 377 (2002) (same).

Mid-Con Freight Sys., Inc. , 545 U.S. at 442-43, 125 S.Ct. 2427 ; Yellow Transp., Inc. , 537 U.S. at 39, 123 S.Ct. 371.

Mid-Con Freight Sys., Inc. , 545 U.S. at 442-43, 125 S.Ct. 2427 ; Yellow Transp., Inc. , 537 U.S. at 39, 123 S.Ct. 371.

Mid-Con Freight Sys., Inc. , 545 U.S. at 443, 125 S.Ct. 2427 ; Yellow Transp., Inc. , 537 U.S. at 39, 123 S.Ct. 371.

Mid-Con Freight Sys., Inc. , 545 U.S. at 443-44, 125 S.Ct. 2427 ; Yellow Transp., Inc. , 537 U.S. at 39-40, 123 S.Ct. 371.

Mid-Con Freight Sys., Inc. , 545 U.S. at 443-44, 125 S.Ct. 2427.

Id. at 443 ; Yellow Transp., Inc. , 537 U.S. at 40, 123 S.Ct. 371.

49 U.S.C. § 14504a(c)(1)(A)-(C).

See id. § 13908.

See id. § 14504a(a)(8), (d)(2)(a)(iii), (d)(7), (f)(1), (4), (g)(1)-(4), (h)(1)-(4).

See id. § 14504a(f)(1).

See id. § 14504a(a)(6), (8), (e), (g), (h)(2).

See id. § 14504a(c)(1)(D), (2).

Id. § 14504a(c)(2).

More specifically, the intrastate transport of household goods and non-consensual tow-truck operations that were excluded from the "general rule" of preemption under 49 U.S.C. § 14501(c)(2)(B) and (C), intrastate transportation of waste or recyclable materials by any carrier, and certain intrastate passenger service that was not subject to federal preemption. Id. § 14504a(c)(1)(D)(ii)(I)-(III).

Id. § 14504a(a)(3).

Id. § 14504a(c)(1)(D).

Id. § 14504a(c)(1)(D)(i), (ii).

The FAAA Act's provision regarding preemption of motor carriers was originally codified at Section 11501, Subsection (h) of Title 49, United States Code. See Federal Aviation Administration Authorization Act of 1994, Pub. L. No. 103-305, § 601(c), 108 Stat. 1569, 1606 (1994) (previously codified at 49 U.S.C. § 11501(h) ). Section 11501(h) was later re-codified at Section 14501, Subsection(c) of Title 49, United States Code. See Interstate Commerce Commission Termination Act of 1995, Pub. L. No. 104-88, § 103, 109 Stat. 803, 899 (1995) (codified at 49 U.S.C. § 14501(c) ).

See generally American Trucking Ass'ns, Inc. v. City of Los Angeles , 660 F.3d 384, 395 (9th Cir. 2011) ("Congress enacted the FAAA Act ... to prevent States from undermining federal deregulation of interstate trucking." (citing Rowe v. N.H. Motor Transp. Ass'n , 552 U.S. 364, 368, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008) )), reversed in part on other grounds , 569 U.S. 641, 133 S.Ct. 2096, 186 L.Ed.2d 177 (2013) ; Automobile Club of N.Y., Inc. v. Dykstra , 520 F.3d 210, 214 (2d Cir. 2008) (per curiam) ("[T]he FAAA Act amended the Interstate Commerce Act to preempt state regulation of certain aspects of motor carriers[.]")).

49 U.S.C. § 14501(c)(1).

Id.

Id. § 14501(c)(2)(A). Also excluded from the "general rule" were intrastate transportation of household goods, id. § 14501(c)(2)(B); non-consensual tow-truck operations, id. § 14501(c)(2)(C); and certain "[s]tate standard transportation practices" (e.g., cargo liability rules) provided these were deemed no more burdensome than federal counterparts or were consented to by the motor carrier, id. § 14501(c)(3).

See generally Unified Carrier Registration Agreement (updated July 14, 2016), available at https://www.ucr.in.gov/MCS/UCRAgreement.pdf. (last visited Mar. 26, 2017) (referenced herein as UCR Agreement).

See generally The Unified Carrier Registration Act of 2005 Informal Guidance for Interested Parties (revised Dec. 9, 2015), available at https://www.ucr.in.gov/MCS/UCRFAQ.pdf (last visited Mar. 26, 2017) (referenced herein as Informal Guidance ); see also Sunset I , 357 S.W.3d at 705 n.11 (consulting earlier iteration of the Informal Guidance ).

See Informal Guidance at 4 ("[Section] 14504a(c) prohibits a State from requiring an interstate motor carrier, or motor private carrier of property, to register with it the carrier's interstate operations, to file information concerning the carrier's federally required insurance, [or] to file the name of the carrier's federally required agent for service of process[.]"); id. at 11 (regarding "enforcement of financial responsibility laws for interstate motor private carriers of property or for-hire motor carriers transporting property," advising that "[w]ith regard to the filing of proof of financial responsibility, the UCR Act has taken this area away from the States, and put it with the filing of proof of financial responsibility, the UCR Act has taken this area away from the States, and put it with the [Federal Motor Carrier Safety Administration] as part of the Unified Registration System").

Informal Guidance at 3.

See UCR Agreement at 10 ("The [UCR] registrant must comply with any initial application filing [for intrastate operating authority], filing proof of insurance, tariff or reporting filing in effect by State law or agency rule. Any fee associated with these processes may also be charged."); Informal Guidance at 3-4 ("Section 14504a draws a distinction between the requirements (including the requirement to pay a fee) a State may impose on an interstate carrier when it initially applies for intrastate operating authority, and those requirements that pertain to the renewal of the intrastate authority by an interstate carrier.... A State may: ... Require an interstate carrier to complete the application requirements, including the fees and proof of insurance coverage, for an initial application for intrastate operating authority.").

See UCR Agreement at 10 ("Once the [UCR] registrant has complied with the filing requirements and payment of the UCR fees, the State may not require any additional payment of motor vehicle fees or issue any credentials for operations within or through the State for an annual intrastate renewal [excepting the categories of intrastate operations previously noted]. ... No annual renewal of intrastate authority or other annual filing (including proof of insurance) may be required of a compliant UCR registrant."); Informal Guidance at 4 ("A State shall not: ... Require an interstate motor carrier ... to renew or charge a fee to renew its intrastate authority or insurance filings or any other filings required of an intrastate carrier," subject to the aforementioned exceptions). The Informal Guidance further indicates that, similarly, "[a] State may require [an] insurance or surety bond filing as part of the initial issuance of the intrastate authority, but under § 14054a(c)(1) not annually thereafter." Informal Guidance at 11.

Id.

Id.

See generally Tex. Transp. Code §§ 645.001 -004 (delegating authority to, among other things, participate "to the fullest extent practicable ... in a federal motor carrier registration program under the unified carrier registration system ....").

See 43 Tex. Admin. Code § 218.17(a), (c) (Texas Dep't of Motor Vehicles, Unified Carrier Registration System).

See id. § 218.17(b).

Act of May 28, 2007, 80th Leg., R.S., ch. 1396, § 17, sec. 643.002(1), 2007 Tex. Gen. Laws 4792, 4796 (codified at Tex. Transp. Code § 643.002(1) ). As previously explained, the federal statute establishing the Single State Registration system, Section 14504 of Title 49, United States Code, was repealed to make way for the Unified Carrier Registration System.

43 Tex. Admin. Code § 218.2(8)(B)(v) (Texas Dep't of Motor Vehicles, Definitions); see also itation index="103" url="https://cite.case.law/citations/?q=43%20Tex.%20Admin.%20Code%20%C2%A7%20218.2">id. § 218.11(a) (making certificate of intrastate operating authority condition for motor carrier to operate a "commercial motor vehicle upon the public roads or highways of this state").

See id. § 218.14(c)(1).

See id. §§ 218.13(a)(11)(B), 218.14(c)(3), (4).

See id. § 218.14(c)(2).

See Tex. Transp. Code § 643.101(e)(1) ("... any insurance required for a commercial motor vehicle must be obtained from ... an insurer authorized to do business in this state whose aggregate net risk, after reinsurance, under any one insurance policy is not in excess of 10 percent of the insurer's policyholders' surplus, and credit for such reinsurance is permitted by law").

See 43 Tex. Admin. Code § 218.14(c)(2).

Id. § 218.16(e)(1)(A).

See Tex. Gov't Code § 2001.038 (a), (c) (authorizing plaintiff who "allege[s] that [a] rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff" to assert declaratory-judgment action to determine "[t]he validity or applicability of a rule" and requiring that "[t]he state agency must be made a party to the action").

See generally Tex. Civ. Prac. & Rem. Code §§ 37.001 -.011.

See id. § 37.009 ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just.").

See, e.g., City of El Paso v. Heinrich , 284 S.W.3d 366, 372-77 (Tex. 2009) (explaining nature of and requirements for ultra vires claims). In accordance with these requirements, appellants named as a defendant the TDMV's director, in her official capacity. See ids="7301546" index="111" url="https://cite.case.law/sw3d/284/366/#p372">id. at 372-73.

43 Tex. Admin. Code § 218.16(e)(1)(A).

Id. § 218.14(c)(2).

The substance of these five legal contentions is presented in appellants' first through sixth issues on appeal. In a seventh issue, appellants complain of the district court's exclusion of a summary-judgment affidavit they had submitted in connection with a motion filed earlier in the case. Appellants fail to explain how this ruling would be material to our review of the final judgment (which, as noted, followed a bench trial), let alone harmful.

As appellees acknowledge, valid claims under APA Section 2001.038 would not be barred by immunity. See Sunset I , 357 S.W.3d at 702.

While appellees did not perfect their own appeal and would generally be required to do so when seeking appellate relief more favorable than the trial court's judgment, see Tex. R. App. P. 25.1(c) ("The appellate court may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause."), the rationale of Rusk State Hospital would permit them to urge (or re-urge) these jurisdictional challenges in the context of the appeal appellants have perfected. See Rusk State Hosp. v. Black , 392 S.W.3d 88, 94-96 (Tex. 2012) (holding that interlocutory-appeal statute cannot constitutionally be construed to prohibit appellate courts from addressing immunity-based jurisdictional challenge raised for the first time on appeal).

See ids="8160976" index="116" url="https://cite.case.law/sw3d/279/608/#p611">id. And contrary to appellants' view, these jurisdictional issues have not "already been heard and ruled upon by this Court" in Sunset I. Although Sunset I did address a previous jurisdictional challenge by appellants, the procedural posture at the time was quite different than now-a challenge to the sufficiency of a since-superseded version of appellants' pleadings, as opposed to a final judgment following a bench trial. See Sunset I , 357 S.W.3d at 697-98 (noting that appellees' jurisdictional challenge targeted sufficiency of a prior version of appellants' petition), 701-05 (holding that appellants had failed to invoke jurisdiction via APA Section 2001.038 due to failure to challenge any "rule," but remanding for repleading). And this posture and its implications for our standard of review were critical to our holding, emphasized by appellants, that they had pleaded facts that would be ultra vires of TDMV's authority vis-à-vis UCR Act preemption, see id. at 705-06, as we explain infra.

See U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); Oneok, Inc. v. Learjet, Inc. , --- U.S. ----, 135 S.Ct. 1591, 1595, 191 L.Ed.2d 511 (2015) ("Congress may ... pre-empt, i.e. , invalidate, a state law through federal legislation."); MCI Sales & Serv., Inc. v. Hinton , 329 S.W.3d 475, 481-82 (Tex. 2010) ("[A] law passed by Congress-acting within its enumerated powers-and signed by the President preempts any state law to the contrary, rendering it without effect." (citing, among other cases, Maryland v. Louisiana , 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981) )).

See Oneok , Inc., 135 S.Ct. at 1595 ("[Congress] may [pre-empt a state law] through express language in a statute. But even where ... a statute does not refer expressly to pre-emption, Congress may implicitly pre-empt a state law, rule, or other state action.... It may do so either through 'field' pre-emption or 'conflict' pre-emption.'" (internal citation omitted)); MCI Sales & Serv., Inc. , 329 S.W.3d at 482 ("Congress may expressly preempt state law by means of statutory language, ... or it may do so impliedly in one of two ways, by so thoroughly occup[ying] a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it, ... or by enacting a law that actually conflicts with state law[.]" (citations omitted) (internal quotation marks omitted)).

Medtronic, Inc. v. Lohr , 518 U.S. 470, 484, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (citation omitted). "Congress' intent ... primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it." Id. at 486, 116 S.Ct. 2240 (citation omitted) (internal quotation marks omitted). "Also relevant ... is the structure and purpose of the statute as a whole, ... as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." Id. (internal citation omitted) (internal quotation marks omitted).

Id. at 485 (citations omitted) (internal quotation marks omitted); MCI Sales & Serv., Inc. , 329 S.W.3d at 482 (quoting Wyeth v. Levine , 555 U.S. 555, 565, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009) ).

Graber v. Fuqua , 279 S.W.3d 608, 611 (Tex. 2009) (citing Great Dane Trailers, Inc. v. Estate of Wells , 52 S.W.3d 737, 743 (Tex. 2001) ); see also Lohr , 518 U.S. at 485, 116 S.Ct. 2240 ("[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action.").

Graber , 279 S.W.3d at 611 (citing Lohr , 518 U.S. at 485, 116 S.Ct. 2240 ; Cipollone v. Liggett Grp., Inc. , 505 U.S. 504, 523, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) ). "[W]hen Congress does exercise its paramount authority, it is obvious that Congress may determine how far its regulation shall go." Id. (quoting Kelly v. Washington ex rel. Foss Co. , 302 U.S. 1, 10, 58 S.Ct. 87, 82 L.Ed. 3 (1937) ). In other words, "Congress may circumscribe its regulation and occupy only a limited field. When it does so, state regulation outside that limited field and otherwise admissible is not forbidden or displaced." Id. (quoting Kelly , 302 U.S. at 10, 58 S.Ct. 87 ).

MCI Sales & Serv., Inc. , 329 S.W.3d at 487 (quoting Rice v. Santa Fe Elevator Corp. , 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947) ).

Lohr , 518 U.S. at 485, 116 S.Ct. 2240 ("In all pre-emption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' ... we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " (quoting Rice , 331 U.S. at 230, 67 S.Ct. 1146 )); MCI Sales & Serv., Inc. , 329 S.W.3d at 487 ("The United State[s] Supreme Court noted a presumption against preemption in Rice v. Santa Fe Elevator Corp. , grounding it in the states' police power to regulate for the good of their citizens[.]"); see also Bates v. Dow Agrosciences LLC , 544 U.S. 431, 449, 125 S.Ct. 1788, 161 L.Ed.2d 687 (2005) ("In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest." (citations omitted) (internal quotation marks omitted)).

MCI Sales & Serv., Inc. , 329 S.W.3d at 487 (quoting Lohr , 518 U.S. at 475, 116 S.Ct. 2240 ) (citations omitted) (internal quotation marks omitted).

See Tex. Transp. Code § 643.101(b).

See, e.g., MAG-T, L.P. v. Travis Cent. Appraisal Dist , 161 S.W.3d 617, 634-35 (Tex. App.-Austin 2005, pet. denied) (discussing limitations against collateral attacks on agency orders) (citing Grounds v. Tolar Indep. Sch. Dist. , 707 S.W.2d 889, 892 (Tex.1986), abrogated on other grounds, Dubai Petroleum Co. v. Kazi , 12 S.W.3d 71, 76-77 (Tex. 2000) ).
While not disputing that Sunset's intrastate operating authority had been revoked and remained so, appellants suggest there is some reason to doubt that MEL's intrastate authority was ever actually revoked, claiming that MEL "had no record" of that event. But the district court heard contrary evidence, as appellees point out, and ultimately found that both Sunset and MEL's intrastate operating authority had been revoked for "failure to maintain insurance or proof of financial responsibility," that Sunset had never attempted to re-register, and that while MEL had subsequently re-registered and regained its intrastate operating authority, that authority had been revoked again. We remain unpersuaded that these findings can be disturbed. See City of Keller v. Wilson , 168 S.W.3d 802, 822 (Tex. 2005) ("A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement.... [T]he court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." (citations omitted)); Cain v Bain , 709 S.W.2d 175, 176 (Tex. 1986) (per curiam) (when conducting factual sufficiency review, "the court of appeals must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust" (citations omitted)).

49 U.S.C. § 14504a(c)(2).

Id. § 14504a(c)(1)(D).

Id. § 14504a(c)(1)(D)(ii).

Id. § 14501(c)(2)(A) (emphasis added).

See Ace Auto Body & Towing, Ltd. v. City of N.Y. , 171 F.3d 765, 768, 776 (2d Cir. 1999) (concluding specific city requirements, including that towing companies maintain liability insurance and post a surety bond to qualify for a license, "[were] so directly related to safety or financial responsibility and impose[d] so peripheral and incidental an economic burden that no detailed analysis [was] necessary to conclude that they [fell] within the § 14501(c)(2)(A) exemptions"), holding modified on other grounds by Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury , 445 F.3d 136, 145 (2d Cir. 2006) ; see also Worldwide Moving & Storage, Inc. v. District of Columbia , 445 F.3d 422, 426 (D.C. Cir. 2006) (observing that, while Section 14501(c)(1)"prohibits a state from enacting or enforcing laws or regulations governing certain aspects of interstate transportation[,] Section 14501(c)(2)(A), however, ... appears to exempt from the prohibition the surety bond requirement imposed on [appellant]."). The UCR Informal Guidance is in accord. See Informal Guidance at 11 ("[A] State may enforce its laws requiring liability coverage for any vehicle operating on the State's public ways. In other words, if an interstate motor carrier is found to be operating on a State's highways without liability insurance coverage, the State may take an action against that motor carrier.").

Lohr , 518 U.S. at 485, 116 S.Ct. 2240 (quoting Rice , 331 U.S. at 230, 67 S.Ct. 1146 ); see also Bates , 544 U.S. at 449, 125 S.Ct. 1788 ("In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest." (citations omitted) (internal quotation marks omitted)); MCI Sales & Serv., Inc. , 329 S.W.3d at 487 (noting "presumption against preemption ... ground[ed] ... in the states' police power to regulate for the good of their citizens[.]" (discussing Rice , 331 U.S. at 230, 67 S.Ct. 1146 ).

49 U.S.C. § 14504a(c)(1)(D)(ii).

Id. § 14501(c)(2)(A).

Id. § 14504a(c)(1)(D).

See 357 S.W.3d at 705-06.

Id.

43 Tex. Admin. Code § 218.16(e)(1)(A) (emphases added).

See 49 U.S.C. § 14504a(c)(1)(D).

See, e.g., Texas Ass'n of Bus. v. Texas Air Control Bd. , 852 S.W.2d 440, 445-46 (Tex. 1993) ("We ... hold that standing, as a component of subject matter jurisdiction, cannot be waived ... and may be raised for the first time on appeal by the parties or by the court.").

See supra note 93.

See 43 Tex. Admin. Code § 218.16(e)(2), (4).

Id. § 218.16(e)(2)(A).

See id. § 218.16(e)(3).

See id. § 218.16(e)(2)(D).

See id. § 218.16(e)(3); see also id. § 218.13(e)(7) (regarding "supplemental application" to retain revoked or suspended certificate of registration number).

See id. § 218.16(e)(3).

See id. § 218.16(e)(2)(C).

See id. § 218.16(e)(2)(E).

See id. § 218.16(e)(2)(F).

See id. § 218.16(e)(2)(B), (f).

Id. § 218.16(e)(2)(G), (g).

49 U.S.C. § 14504a(c)(1)(D).

See Bates , 544 U.S. at 449, 125 S.Ct. 1788 ; Lohr , 518 U.S. at 485, 116 S.Ct. 2240 ; Rice , 331 U.S. at 230, 67 S.Ct. 1146 ; MCI Sales & Serv., Inc. , 329 S.W.3d at 487 ; Graber , 279 S.W.3d at 611.

Tex. Transp. Code § 643.002(1) (emphasis added).

Id. (emphases added).

See 49 U.S.C. § 14504a(c)(1)(D).

Id. at § 14504a(c)(1)(A) (deeming it "an unreasonable burden upon interstate commerce" for a state or political subdivision "to enact, impose, or enforce any ... standards with respect to, or levy any fee or charge on, any [interstate] motor carrier ... in connection with ... (A) the registration with the State of the interstate operations of the motor carrier ..."). As previously noted, states are similarly proscribed from requiring filing with the state of information relating to federal financial responsibility or the carrier's federally required agents for service of process. See id. § 14504a(c)(1)(B), (C).

See id. § 14504a(c)(1)(D).

See Tex. Transp. Code § 643.002(1).

"When construing a statute, our primary objective is to ascertain and give effect to the Legislature's intent." TGS-NOPEC Geophysical Co. v. Combs , 340 S.W.3d 432, 439 (Tex. 2011) (citing Tex. Gov't Code § 312.005 ; Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc. , 145 S.W.3d 170, 176 (Tex. 2004) ). For an unambiguous statute, "we adopt the interpretation supported by its plain language unless such an interpretation would lead to absurd results." Id. (citing Mega Child Care, Inc. , 145 S.W.3d at 177 ). We "consider statutes as a whole," ids="9147096" index="224" url="https://cite.case.law/sw3d/145/170/#p176">id. (citing Texas Dep't of Transp. v. City of Sunset Valley , 146 S.W.3d 637, 642 (Tex. 2004) ), and "[w]e presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen." Id. (citing In re M.N. , 262 S.W.3d 799, 802 (Tex. 2008) ).

See The American Heritage Dictionary of the English Language 621 (5th ed. 2011) (defining "exempt" (when used as an adjective) as "[f]reed from an obligation, duty, or liability to which others are subject").

See id. at 255 (defining "by" as "[t]hrough the agency or action of: was killed by a bullet ").

49 U.S.C. § 14504a(c)(1)(D) ; see id. § 14501(c)(2)(A).

See 43 Tex. Admin. Code § 218.17(b).

See ids="8160976" index="229" url="https://cite.case.law/sw3d/279/608/#p611">id. § 218.14(c)(1).