(Slip Opinion)     OCTOBER TERM, 2012     1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## AMERICAN TRUCKING ASSOCIATIONS, INC. *v.* CITY OF LOS ANGELES, CALIFORNIA, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 11–798.   Argued April 16, 2013—Decided June 13, 2013

The Port of Los Angeles, a division of the City of Los Angeles, is run by a Board of Harbor Commissioners pursuant to a municipal ordinance known as a tariff.  The Port leases marine terminal facilities to operators that load cargo onto and unload it from docking ships.  Federally licensed short-haul trucks, called "drayage trucks," assist in those operations by moving cargo into and out of the Port.  In 2007, in response to community concerns over the impact of a proposed port expansion on traffic, the environment, and safety, the Board implemented a Clean Truck Program.  As part of that program, the Board devised a standard-form "concession agreement" to govern the relationship between the Port and drayage companies.  The agreement requires a company to affix a placard on each truck with a phone number for reporting concerns, and to submit a plan listing off-street parking locations for each truck.  Other requirements relate to a company's financial capacity, its maintenance of trucks, and its employment of drivers.  The concession agreement sets out penalties for violations, including possible suspension or revocation of the right to provide drayage services.  The Board also amended the Port's tariff to ensure that every drayage company would enter into the agreement. The amended tariff makes it a misdemeanor, punishable by fine or imprisonment, for a terminal operator to grant access to an unregistered drayage truck.

 Petitioner American Trucking Associations, Inc. (ATA), whose members include many of the drayage companies at the Port, sued the Port and City, seeking an injunction against the concession agreement's requirements.  ATA principally contended that the requirements are expressly preempted by the Federal Aviation Admin-

istration Authorization Act of 1994 (FAAAA), see 49 U. S. C. §14501(c)(1). ATA also argued that even if the requirements are valid, *Castle* v. *Hayes Freight Lines, Inc.*, 348 U. S. 61, prevents the Port from enforcing the requirements by withdrawing a defaulting company's right to operate at the Port. The District Court held that neither §14501(c)(1) nor *Castle* prevented the Port from proceeding with its program. The Ninth Circuit mainly affirmed, finding only the driver-employment provision preempted and rejecting petitioner's *Castle* claim.

*Held*:

   1. The FAAAA expressly preempts the concession agreement's placard and parking requirements. Section 14501(c)(1) preempts a state "law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U. S. C. §14501(c)(1). Because the parties agree that the Port's placard and parking requirements relate to a motor carrier's price, route, or service with respect to transporting property, the only disputed question is whether those requirements "hav[e] the force and effect of law." Section 14501(c)(1) draws a line between a government's exercise of regulatory authority and its own contract-based participation in a market. The statute's "force and effect of law" language excludes from the clause's scope contractual arrangements made by a State when it acts as a market participant, not as a regulator. See, *e.g., American Airlines, Inc.* v. *Wolens*, 513 U. S. 219, 229. But here, the Port exercised classic regulatory authority in imposing the placard and parking requirements. It forced terminal operators—and through them, trucking companies—to alter their conduct by implementing a criminal prohibition punishable by imprisonment. That counts as action "having the force and effect of law" if anything does.

   The Port's primary argument to the contrary focuses on motives rather than means. But the Port's proprietary intentions do not control. When the government employs a coercive mechanism, available to no private party, it acts with the force and effect of law, whether or not it does so to turn a profit. Only if it forgoes the (distinctively governmental) exercise of legal authority may it escape §14501(c)(1)'s preemptive scope. That the criminal sanctions fall on terminal operators, not directly on the trucking companies, also makes no difference. See, *e.g.*, *Rowe* v. *New Hampshire Motor Transp. Assn.*, 552 U. S. 364, 371–373. Pp. 6−10.

   2. This Court declines to decide in the case's present, pre-enforcement posture whether *Castle* limits the way the Port can enforce the financial-capacity and truck-maintenance requirements upheld by the Ninth Circuit. *Castle* rebuffed a State's attempt to bar a

federally licensed motor carrier from its highways for past infringe-
ments of state safety regulations. But *Castle* does not prevent a
State from taking off the road a vehicle that is contemporaneously
out of compliance with such regulations. And at this juncture, there
is no basis for finding that the Port will actually use the concession
agreement's penalty provision as *Castle* proscribes. Pp. 10–12.

660 F. 3d 384, reversed in part and remanded.

    KAGAN, J., delivered the opinion for a unanimous Court. THOMAS, J.,
filed a concurring opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 11–798

AMERICAN TRUCKING ASSOCIATIONS, INC., PETITIONER *v.* CITY OF LOS ANGELES, CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 13, 2013]

JUSTICE KAGAN delivered the opinion of the Court.

In this case, we consider whether federal law preempts certain provisions of an agreement that trucking companies must sign before they can transport cargo at the Port of Los Angeles. We hold that the Federal Aviation Administration Authorization Act of 1994 (FAAAA) expressly preempts two of the contract's provisions, which require such a company to develop an off-street parking plan and display designated placards on its vehicles. We decline to decide in the case's present, pre-enforcement posture whether, under *Castle* v. *Hayes Freight Lines, Inc.*, 348 U. S. 61 (1954), federal law governing licenses for interstate motor carriers prevents the Port from using the agreement's penalty clause to punish violations of other, non-preempted provisions.

I
A

The Port of Los Angeles, a division of the City of Los Angeles, is the largest port in the country. The Port owns marine terminal facilities, which it leases to "terminal

operators" (such as shipping lines and stevedoring compa-
nies) that load cargo onto and unload it from docking
ships.  Short-haul trucks, called "drayage trucks," move
the cargo into and out of the Port.  The trucking compa-
nies providing those drayage services are all federally
licensed motor carriers.  Before the events giving rise
to this case, they contracted with terminal operators to
transport cargo, but did not enter into agreements with
the Port itself.

The City's Board of Harbor Commissioners runs the
Port pursuant to a municipal ordinance known as a tariff,
which sets out various regulations and charges.  In the
late 1990's, the Board decided to enlarge the Port's facili-
ties to accommodate more ships.  Neighborhood and envi-
ronmental groups objected to the proposed expansion,
arguing that it would increase congestion and air pollution
and decrease safety in the surrounding area.  A lawsuit
they brought, and another they threatened, stymied the
Board's development project for almost 10 years.

To address the community's concerns, the Board imple-
mented a Clean Truck Program beginning in 2007.
Among other actions, the Board devised a standard-form
"concession agreement" to govern the relationship between
the Port and any trucking company seeking to operate on
the premises.   Under that contract, a company may
transport cargo at the Port in exchange for complying with
various requirements.   The two directly at issue here
compel the company to (1) affix a placard on each truck
with a phone number for reporting environmental or
safety concerns (You've seen the type: "How am I driving?
213–867–5309") and (2) submit a plan listing off-street
parking locations for each truck when not in service.
Three other provisions in the agreement, formerly dis-
puted in this litigation, relate to the company's financial
capacity, its maintenance of trucks, and its employment of
drivers.

The Board then amended the Port's tariff to ensure that every company providing drayage services at the facility would enter into the concession agreement. The mechanism the Board employed is a criminal prohibition on terminal operators. The amended tariff provides that "no Terminal Operator shall permit access into any Terminal in the Port of Los Angeles to any Drayage Truck unless such Drayage Truck is registered under a Concession [Agreement]." App. 105. A violation of that provision— which occurs "each and every day" a terminal operator provides access to an unregistered truck—is a misdemeanor. *Id.,* at 86. It is punishable by a fine of up to $500 or a prison sentence of up to six months. *Id.,* at 85–86.

The concession agreement itself spells out penalties for any signatory trucking company that violates its requirements. When a company commits a "Minor Default," the Port may issue a warning letter or order the company to undertake "corrective action," complete a "course of . . . training," or pay the costs of the Port's investigation. *Id.,* at 81–82. When a company commits a "Major Default," the Port may also suspend or revoke the company's right to provide drayage services at the Port. *Id.,* at 82. The agreement, however, does not specify which breaches of the contract qualify as "Major," rather than "Minor." And the parties agree that the Port has never suspended or revoked a trucking company's license to operate at the Port for a prior violation of one of the contract provisions involved in this case. See Tr. of Oral Arg. 42–43, 49–51.

B

Petitioner American Trucking Associations, Inc. (ATA), is a national trade association representing the trucking industry, including drayage companies that operate at the Port. ATA filed suit against the Port and City, seeking an injunction against the five provisions of the concession agreement discussed above. The complaint principally

contended that §14501(c)(1) of the FAAAA expressly preempts those requirements. That statutory section states:

> "[A] State [or local government] may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U. S. C. §14501(c)(1).[1]

ATA also offered a back-up argument: Even if the requirements are valid, ATA claimed, the Port may not enforce them by withdrawing a defaulting company's right to operate at the Port. That argument rested on *Castle* v. *Hayes Freight Lines, Inc.*, 348 U. S. 61 (1954), which held that Illinois could not bar a federally licensed motor carrier from its highways for prior violations of state safety regulations. We reasoned in *Castle* that the State's action conflicted with federal law providing for certification of motor carriers; and ATA argued here that a similar conflict would inhere in applying the concession agreement to suspend or revoke a trucking company's privileges. Following a bench trial, the District Court held that neither §14501(c)(1) nor *Castle* prevents the Port from proceeding with any part of its Clean Truck Program.

The Court of Appeals for the Ninth Circuit mainly affirmed. Most important for our purposes, the court held that §14501(c)(1) does not preempt the agreement's plac-

_____

[1] ATA also contended that a separate provision, 49 U. S. C. §14506(a), preempts the agreement's placard requirement. That section bars state and local governments from enacting or enforcing "any law, rule, regulation[,] standard, or other provision having the force and effect of law" that obligates a motor carrier to display any form of identification other than those the Secretary of Transportation has required. *Ibid.* The just-quoted language is the only part of §14506(a) disputed here, and it is materially identical to language in §14501(c)(1). We focus on §14501(c)(1) for ease of reference, but everything we say about that provision also applies to §14506(a).

ard and parking requirements because they do not
"'ha[ve] the force and effect of law.'" 660 F. 3d 384, 395
(2011) (quoting §14501(c)(1)). The court reasoned that
those requirements, rather than regulating the drayage
market, advance the Port's own "business interest" in
"managing its facilities." *Id.,* at 401. Both provisions were
"designed to address [a] specific proprietary problem[]"—
the need to "increase the community good-will necessary
to facilitate Port expansion." *Id.,* at 406–407; see *id.,* at
409. The Ninth Circuit also held the agreement's
financial-capacity and truck-maintenance provisions not
preempted, for reasons not relevant here.[2] Section
14501(c)(1), the court decided, preempts only the contract's
employment provision. Finally, the Ninth Circuit rejected
ATA's claim that *Castle* bars the Port from applying the
agreement's penalty clause to withdraw a trucking com-
pany's right to operate at the facility. The court thought
*Castle* inapplicable because of the narrower exclusion in
this case: "Unlike a ban on using *all* of a State's freeways,"
the court reasoned, "a limitation on access to a single Port
does not prohibit motor carriers" from generally partici-
pating in interstate commerce. 660 F. 3d, at 403.

We granted certiorari to resolve two questions: first,
whether §14501(c)(1) of the FAAAA preempts the conces-
sion agreement's placard and parking provisions; and
second, whether *Castle* precludes reliance on the agree-
ment's penalty clause to suspend or revoke a trucking
company's privileges. See 568 U. S. \_\_\_ (2013). Contrary
to the Ninth Circuit, we hold that the placard and parking
requirements are preempted as "provision[s] having the
force and effect of law." That determination does not

_____

[2] For those curious, the court held that the financial-capacity re-
quirement is not "'related to a [motor carrier's] price, route, or service,'"
and that the truck-maintenance requirement falls within a statutory
exception for safety regulation. 660 F. 3d, at 395, 403–406 (quoting
§14501(c)(1)); see §14501(c)(2)(A) (safety exception).

obviate the enforcement issue arising from *Castle* because
the Ninth Circuit's rulings upholding the agreement's
financial-capacity and truck-maintenance provisions have
now become final;[3] accordingly, the Port could try to apply
its penalty provision to trucking companies that have
violated those surviving requirements. But we nonethe-
less decline to address the *Castle* question because the
case's pre-enforcement posture obscures the nature of the
agreement's remedial scheme, rendering any decision at
this point a shot in the dark.

## II

Section 14501(c)(1), once again, preempts a state "law,
regulation, or other provision having the force and effect of
law related to a price, route, or service of any motor car-
rier . . . with respect to the transportation of property." All
parties agree that the Port's placard and parking require-
ments relate to a motor carrier's price, route, or service
with respect to transporting property. The only disputed
question is whether those requirements "hav[e] the force
and effect of law." The Port claims that they do not, be-
cause the "concession contract is just [like] a private
agreement," made to advance the Port's commercial and
"proprietary interests." Brief for Respondent City of Los
Angeles et al. 19 (Brief for City of Los Angeles) (internal
quotation marks omitted).[4]

---

[3] ATA's petition for certiorari did not seek review of the Ninth Cir-
cuit's determination that the truck-maintenance provision is valid. The
petition did ask us to consider the court's ruling on the financial-
capacity provision, but we declined to do so.

[4] The Port's brief occasionally frames the issue differently—as whether
a freestanding "market-participant exception" limits §14501(c)(1)'s
express terms. See Brief for City of Los Angeles 24. But at oral argu-
ment, the Port emphasized that the supposed exception it invoked in
fact derives from §14501(c)(1)'s "force and effect of law" language. See
Tr. of Oral Arg. 31 ("[W]hat we are calling the market participant
exception . . . is generally congruent with[] what is meant by Congress

We can agree with the Port on this premise: Section 14501(c)(1) draws a rough line between a government's exercise of regulatory authority and its own contract-based participation in a market. We recognized that distinction in *American Airlines, Inc.* v. *Wolens*, 513 U. S. 219 (1995), when we construed another statute's near-identical "force and effect of law" language. That phrase, we stated, "connotes official, government-imposed policies" prescribing "binding standards of conduct." *Id.,* at 229, n. 5 (internal quotation marks omitted). And we contrasted that quintessential regulatory action to "contractual commitment[s] voluntarily undertaken." *Id.,* at 229 (internal quotation marks omitted). In *Wolens*, we addressed a State's enforcement of an agreement between two private parties. But the same reasoning holds if the government enters into a contract just as a private party would—for example, if a State (or City or Port) signs an agreement with a trucking company to transport goods at a specified price. See, *e.g., Building & Constr. Trades Council* v. *Associated Builders & Contractors of Mass./R. I., Inc.*, 507 U. S. 218, 233 (1993) (When a State acts as a purchaser of services, "it does not 'regulate' the workings of the market . . . ; it exemplifies them" (some internal quotation marks omitted)). The "force and effect of law" language in §14501(c)(1) excludes such everyday contractual arrangements from the clause's scope. That phrasing targets the State acting as a State, not as any market actor—or otherwise said, the State acting in a regulatory rather than proprietary mode.

But that statutory reading gets the Port nothing, because it exercised classic regulatory authority—complete

─────────

by the term 'force and effect of law'"); *id.*, at 39–40 ("I'm . . . relying on the language . . . force and effect of law," which "invites a market participant analysis"). We therefore have no occasion to consider whether or when a preemption clause lacking such language would except a state or local government's proprietary actions.

with the use of criminal penalties—in imposing the placard and parking requirements at issue here. Consider again how those requirements work. They are, to be sure, contained in contracts between the Port and trucking companies. But those contracts do not stand alone, as the result merely of the parties' voluntary commitments. The Board of Harbor Commissioners aimed to "require parties who access Port land and terminals for purposes of providing drayage services" to enter into concession agreements with the Port. App. 108 (Board's "Findings"). And it accomplished that objective by amending the Port's tariff—a form of municipal ordinance—to provide that "no Terminal Operator shall permit" a drayage truck to gain "access into any Terminal in the Port" unless the truck is "registered under" such a concession agreement. *Id.*, at 105. A violation of that tariff provision is a violation of criminal law. And it is punishable by a fine or a prison sentence of up to six months. *Id.,* at 85–86. So the contract here functions as part and parcel of a governmental program wielding coercive power over private parties, backed by the threat of criminal punishment.

That counts as action "having the force and effect of law" if anything does. The Port here has not acted as a private party, contracting in a way that the owner of an ordinary commercial enterprise could mimic. Rather, it has forced terminal operators—and through them, trucking companies—to alter their conduct by implementing a criminal prohibition punishable by time in prison. In some cases, the question whether governmental action has the force of law may pose difficulties; the line between regulatory and proprietary conduct has soft edges. But this case takes us nowhere near those uncertain boundaries. Contractual commitments resulting not from ordinary bargaining (as in *Wolens*), but instead from the threat of criminal sanctions manifest the government *qua* government, performing its prototypical regulatory role.

The Port's primary argument to the contrary, like the Ninth Circuit's, focuses on motive rather than means. The Court of Appeals related how community opposition had frustrated the Port's expansion, and concluded that the Clean Truck Program "respon[ded] to perceived business necessity." 660 F. 3d, at 407. The Port tells the identical story, emphasizing that private companies have similar business incentives to "adopt[] 'green growth' plans like the Port's." Brief for City of Los Angeles 30. We have no reason to doubt that account of events; we can assume the Port acted to enhance goodwill and improve the odds of achieving its business plan—just as a private company might. But the Port's intentions are not what matters. That is because, as we just described, the Port chose a tool to fulfill those goals which only a government can wield: the hammer of the criminal law. See *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Mgmt. Auth.*, 438 F. 3d 150, 157 (CA2 2006), aff'd, 550 U. S. 330 (2007). And when the government employs such a coercive mechanism, available to no private party, it acts with the force and effect of law, whether or not it does so to turn a profit. Only if it forgoes the (distinctively governmental) exercise of legal authority may it escape §14501(c)(1)'s preemptive scope.

The Port also tries another tack, reminding us that the criminal sanctions here fall on terminal operators alone, not on the trucking companies subject to the agreement's requirements; hence, the Port maintains, the matter of "criminal penalties is a red herring." Tr. of Oral Arg. 31; see Brief for City of Los Angeles 39–40. But we fail to see why the target of the sanctions makes any difference. The Port selected an indirect but wholly effective means of "requir[ing] parties . . . providing drayage services" to display placards and submit parking plans: To wit, the Port required terminal operators, on pain of criminal penalties, to insist that the truckers make those commit-

ments. App. 108; see *supra,* at 3, 8. We have often rejected efforts by States to avoid preemption by shifting their regulatory focus from one company to another in the same supply chain. See, *e.g.*, *Rowe* v. *New Hampshire Motor Transp. Assn.*, 552 U. S. 364, 371–373 (2008) (finding preemption under the FAAAA although the State's requirements directly targeted retailers rather than motor carriers); *Engine Mfrs. Assn.* v. *South Coast Air Quality Management Dist.*, 541 U. S. 246, 255 (2004) (finding preemption under the Clean Air Act although the requirements directly targeted car buyers rather than sellers). The same goes here. The Port made its regulation of drayage trucks mandatory by imposing criminal penalties on the entities hiring all such trucks at the facility. Slice it or dice it any which way, the Port thus acted with the "force of law."

### III

Our rejection of the concession agreement's placard and parking requirements does not conclude this case. Two other provisions of the agreement are now in effect: As noted earlier, the Ninth Circuit upheld the financial-capacity and truck-maintenance requirements, and that part of its decision has become final. See *supra,* at 5, and n. 2. ATA argues that our holding in *Castle* limits the way the Port can enforce those remaining requirements. According to ATA, the Port may not rely on the agreement's penalty provision to suspend or revoke the right of non-complying trucking companies to operate on the premises.

As we have described, *Castle* rebuffed a State's attempt to bar a federally licensed motor carrier from its highways for past infringements of state safety regulations. A federal statute, we explained, gave a federal agency the authority to license interstate motor carriers, as well as a carefully circumscribed power to suspend or terminate those licenses for violations of law. That statute, we held,

implicitly prohibited a State from "tak[ing] action"—like a ban on the use of its highways—"amounting to a suspension or revocation of an interstate carrier's [federally] granted right to operate." 348 U. S., at 63–64.

The parties here dispute whether *Castle* restricts the Port's remedial authority. The Port echoes the Ninth Circuit's view that banning a truck from "*all* of a State's freeways" is meaningfully different from denying it "access to a single Port." 660 F. 3d, at 403; see Brief for City of Los Angeles 49. ATA responds that because the Port is a "crucial channel of interstate commerce," *Castle* applies to it just as much as to roads. Brief for Petitioner 18.

But we see another question here: Does the Port's enforcement scheme involve curtailing drayage trucks' operations in the way *Castle* prohibits, even assuming that decision applies to facilities like this one? As just indicated, *Castle* puts limits on how a State or locality can punish an interstate motor carrier for prior violations of trucking regulations (like the concession agreement's requirements). Nothing we said there, however, prevents a State from taking off the road a vehicle that is contemporaneously out of compliance with such regulations. Indeed, ATA filed an *amicus* brief in *Castle* explaining that a vehicle "that fails to comply with the state's regulations may be barred from the state's highways." Brief for ATA, O. T 1954, No. 44, p. 12; see Brief for Respondent, *id.*, p. 23 (A State may "stop and prevent from continuing on the highway any motor vehicle which it finds not to be in compliance"). And ATA reiterates that view here, as does the United States as *amicus curiae*. See Reply Brief 22; Brief for United States 29–30. So the Port would not violate *Castle* if it barred a truck from operating at its facilities to prevent an ongoing violation of the agreement's requirements.

And at this juncture, we have no basis for finding that the Port will ever use the agreement's penalty provision

for anything more than that. That provision, to be sure, might be read to give the Port broader authority: As noted earlier, the relevant text enables the Port to suspend or revoke a trucking company's right to provide dray-age services at the facility as a "[r]emedy" for a "Major Default." App. 82; see *supra,* at 3. But the agreement nowhere states what counts as a "Major Default"—and specifically, whether a company's breach of the financial-capacity or truck-maintenance requirements would qual-ify. And the Port has in fact never used its suspension or revocation power to penalize a past violation of those requirements. See Tr. of Oral Arg. 43, 50–51. Indeed, the Port's brief states that "it does not claim[] the authority to punish past, cured violations of the requirements chal-lenged here through suspension or revocation." Brief for City of Los Angeles 62 (internal quotation marks omitted). So the kind of enforcement ATA fears, and believes incon-sistent with *Castle*, might never come to pass at all.

In these circumstances, we decide not to decide ATA's *Castle*-based challenge. That claim, by its nature, attacks the Port's enforcement scheme. But given the pre-enforcement posture of this case, we cannot tell what that scheme entails. It might look like the one forbidden in *Castle* (as ATA anticipates), or else it might not (as the Port assures us). We see no reason to take a guess now about what the Port will do later. There will be time enough to address the *Castle* question when, if ever, the Port enforces its agreement in a way arguably violating that decision.

## IV

Section 14501(c)(1) of the FAAAA preempts the placard and parking provisions of the Port's concession agreement. We decline to decide on the present record ATA's separate challenge, based on *Castle*, to that agreement's penalty provision. Accordingly, the judgment of the Ninth Circuit

is reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 11–798

AMERICAN TRUCKING ASSOCIATIONS, INC., PETITIONER *v.* CITY OF LOS ANGELES, CALIFORNIA, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 13, 2013]

JUSTICE THOMAS, concurring.

I join the Court's opinion in full. I write separately to highlight a constitutional concern regarding §601 of the Federal Aviation Administration Authorization Act of 1994 (FAAAA), 108 Stat. 1606, a statute the Court has now considered twice this Term. See *Dan's City Used Cars, Inc.* v. *Pelkey*, 569 U. S. \_\_\_ (2013).

The Constitution grants Congress authority "[t]o regulate Commerce . . . *among* the several States." Art. I, §8, cl. 3 (emphasis added). Section 14501 of Title 49 is titled "Federal authority over *intrastate* transportation." (Emphasis added.) The tension between §14501 and the Constitution is apparent, because the Constitution does not give Congress power to regulate intrastate commerce. *United States* v. *Lopez*, 514 U. S. 549, 587, n. 2 (1995) (THOMAS, J., concurring). Nevertheless, §14501(c)(1) purports to pre-empt any state or local law "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." By its terms, §14501(c) would pre-empt even a city ordinance establishing a uniform rate for most transportation services originating and ending inside city limits, so long as the services were provided by a motor carrier. Such an extraordinary assertion of congressional authority cannot be reconciled

with our constitutional system of enumerated powers.

The Supremacy Clause provides the constitutional basis for the pre-emption of state laws. Art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land"). Because the Constitution and federal laws are supreme, conflicting state laws are without legal effect. See *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 372 (2000). However, the constitutional text leaves no doubt that only federal laws made "in Pursuance" of the Constitution are supreme. See *Gregory* v. *Ashcroft*, 501 U. S. 452, 460 (1991) ("As long as it is acting *within the powers granted it* under the Constitution, Congress may impose its will on the States" (emphasis added)); *Wyeth* v. *Levine*, 555 U. S. 555, 583–587 (2009) (THOMAS, J., concurring in judgment).

Given this limitation, Congress cannot pre-empt a state law merely by promulgating a conflicting statute—the preempting statute must also be constitutional, both on its face and as applied. As relevant here, if Congress lacks authority to enact a law regulating a particular intrastate activity, it follows that Congress also lacks authority to pre-empt state laws regulating that activity. See U. S. Const., Amdt. 10 ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people").

In this case, the Court concludes that "[s]ection 14501(c)(1) . . . preempts the placard and parking provisions of the Port's concession agreement." *Ante,* at 12. Although respondents waived any argument that Congress lacks authority to regulate the placards and parking arrangements of drayage trucks using the port, I doubt that Congress has such authority. The Court has identified three categories of activity that Congress may regulate under the Commerce Clause: (1) the use of the

channels of interstate commerce; (2) the instrumentalities of interstate commerce, and persons or things in interstate commerce; and (3) "activities having a substantial relation to interstate commerce . . . *i.e.*, those activities that substantially affect interstate commerce." *Lopez, supra*, at 558–559. Drayage trucks that carry cargo into and out of the Port of Los Angeles undoubtedly operate within the "channels of interstate commerce"—for that is what a port is. Congress can therefore regulate conduct taking place within the port. But it is doubtful whether Congress has the power to decide where a drayage truck should park once it has left the port or what kind of placard the truck should display while offsite. Even under the "substantial effects" test, which I have rejected as a "'rootless and malleable standard' at odds with the constitutional design," *Gonzales* v. *Raich*, 545 U. S. 1, 67 (dissenting opinion) (quoting *United States* v. *Morrison*, 529 U. S. 598, 627 (2000) (THOMAS, J., concurring)), it is difficult to say that placards and parking arrangements substantially affect interstate commerce. Congress made no findings indicating that offsite parking—conduct that falls within the scope of the States' traditional police powers—substantially affects interstate commerce. And I doubt that it could. Nevertheless, because respondents did not preserve a constitutional challenge to the FAAAA and because I agree that the provisions in question have the "force and effect of law," I join the Court's opinion.