ORDER Appellants’ petitions for panel rehearing are GRANTED with respect to their request that the court amend its opinion to affirm the district court’s denial of leave to amend but DENIED in all other respects. The petitions for rehearing en banc are DENIED. No future petitions will be entertained. The opinion filed on August 23, 2017 is withdrawn and a new opinion is filed concurrently with this order. Dissent by Judge Tallman OPINION FRIEDLAND, Circuit Judge: We must decide whether the City of Los Angeles, which operates Los Angeles International Airport (“LAX”), can require businesses at the airport to accept certain contractual conditions aimed at preventing service disruptions.[1] Two air transport trade associations argue that the conditions are, in effect, municipal regulations preempted by federal labor law. We hold that the City may impose the conditions in its capacity as proprietor of LAX and thus affirm dismissal of the Complaint. I. Background Airlines that operate out of LAX hire third-party businesses to refuel and load planes, take baggage and tickets, help disabled passengers, and provide similar services. The City licenses those service providers using a contract that imposes certain conditions. One such condition, section 25, requires service providers to enter a “labor peace agreement” with any employee organization that requests one.[2] If such an agreement is not finalized within sixty days, then the dispute must be submitted to mediation and, if mediation is unsuccessful, to binding arbitration. Any labor peace agreement that results from this process must include “binding and enforceable” provisions that prohibit picketing, boycotting, stopping work, or “any other economic interference.” It might seem at first glance that a labor peace agreement would be detrimental to employees’ interests because it deprives them of labor rights. In practice, however, if an employer may not operate without such an agreement, the employer may need to give benefits to its employees to induce them to enter the agreement. Employees have an incentive to trigger negotiations toward labor peace agreements to obtain such benefits. Indeed, here, at least one organization of service employees advocated for inclusion of section 25 when the City was revising its standard LAX licensing contract. Two trade associations who have members that operate at LAX brought suit in the United States District Court for the Central District of California to challenge section 25: Airline Service Providers Association (“ASPA”), an association of third-party service providers; and the Air Transport Association of America (“Airlines”), an association of American airlines. The associations argue that, because the City of Los Angeles operates LAX, the contractual conditions in LAX’s standard licensing agreement are effectively municipal regulations. The associations contend that section 25, as one such “regulation,” is preempted by two federal labor statutes— the National Labor Relations Act (“NLRA”) and the Railway Labor Act (“RLA”)—and by the Airline Deregulation Act (“ADA”). The district court dismissed the Complaint without leave to amend. It dismissed the labor law preemption claims for failure to state a claim and the ADA claim for lack of standing. II. Standing The City challenges .aspects of Plaintiffs’ standing, and, in any event, we have an independent obligation to ensure that we have subject matter jurisdiction. See, e.g., United States v. McIntosh, 833 F.3d 1163, 1173 (9th Cir. 2016). For the reasons that follow, we hold that the ASPA has standing to pursue all of its claims.[3] An association like the ASPA has standing- if (1) its ' individual members would have standing in their own right, (2) the interests at stake in the litigation are germane to the organization’s purposes, and (3) the case may- be litigated without participation by individual members of the association. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing Hunt v. Wash, State Apple Advert. Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). To have standing in their own right, an association’s members must have “suffered an injury ⅛ fact,” that injury must be “fairly traceable to the challenged conduct of the defendant,” and the injury must be “likely to be redressed” by a decision in their favor. Spokeo, Inc. v. Robins, — U.S. —, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). The ASPA has alleged a sufficient injury-in fact. It alleges that its members will be forced into- unwanted negotiations that must terminate in either an agreement or arbitral award—something virtually certain to occur given that an "organization of service employees advocated for section 25, suggesting that employees plan - to make use of the provision. We have recognized that “[t]hé economic costs of complying with a licensing scheme can be sufficient for standing,” Mont. Shooting Sports Ass’n v. Holder, 727 F.3d 975, 980 (9th Cir. 2013), even if “the extent of [the alleged] economic harm is not readily determinable,” Cent. Ariz. Water Conservation Dist. v. EPA, 990 F.2d 1531, 1538 (9th Cir. 1993). Here, ASPA members will at least have to devote resources, and thus incur economic costs, to participate in negotiations, mediation,'and'possibly even binding arbitration over a labor peace agreement, which they would not otherwise be required to discuss. The time spent in those negotiations is itself a concrete injury.[4] Second, the ASPA has shown a sufficient “line of causation” between the City’s actions and this injury. See Allen v. Wright, 468 U.S. 737, 757, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), abrogated on other grounds by Lexmark Int’l, Inc. v. Static Control Components, Inc., — U.S. —, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). The injuries it claims are directly linked to the City’s conduct: The City has made section 25 a mandatory component of its standard licensing contract for service providers at LAX, and section 25 will force service providers to spend time negotiating about a labor peace agreement. This is a sufficient causal .connection. See Cent. Ariz., 990 F.2d at 1538 (holding that economic injury caused by contractual obligations that stemmed from compliance with a regulation were sufficiently caused by the regulation to support standing). Finally, the remedies the ASPA seeks would redress the harm it alleges. See Spokeo, 136 S.Ct. at 1547. If, as the Complaint requests, section 25 were enjoined on the basis of preemption by federal labor law or the ADA, the ASPA’s members would not suffer any adverse consequences of complying with it. See Cent. Ariz., 990 F.2d at 1538 (“[The plaintiffs] economic injury is likely to be redressed by a favorable decision since elimination of the [rule in question] would necessarily eliminate the increased financial burden the rule causes.”). The ASPA’s individual members would therefore have standing in their own right, and the first prong of the test for associational standing is satisfied. The second and third prongs are satisfied as well. The ASPA alleges that it has an organizational interest “in the consistent enforcement of unitary federal regulation of -airline industry labor relations.” The association’s asserted purpose is therefore related to its legal claims in this action—namely, that section 25 is preempted by federal statutes that regulate airlines—satisfying the germaneness prong. As to the third prong, the parties have identified no. reason that the ASPA’s members must participate individually in this case, and neither have we. The ASPA thus meets all the requirements for associational standing.[5] III. Lack of Preemption Having concluded that the ASPA has standing, we now turn to whether its preemption arguments state a claim- on which relief may be granted. .We evaluate this question de novo. Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal., 159 F.3d 1178, 1181 (9th Cir. 1998). “In deciding whether a federal law pre-empts a state [or local] statute, our task is to ascertain Congresses] intent in enacting the federal statute at issue.” Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 738, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)), The Supreme Court has emphasized, however, that generally “pre-emption doctrines apply only to state [or local] regulation." Bldg. & Constr. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc. (Boston Harbor), 507 U.S. 218, 227, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993). When a state or local government buys services or manages property as a private party would, it acts as a “market participant,” not as a regulator, and we presume that its actions are not subject to preemption. See id. at 229, 113 S.Ct. 1190. Only if a statute evinces an intent to preempt such proprietary actions by a state or local government is the presumption overcome and the action preempted. See Engine Mfrs. Ass’n v. S. Coast Air Quality Mgmt. Dist., 498 F.3d 1031, 1041-42 (9th Cir. 2007). For the reasons that follow, we hold first that the City was acting as a market participant and not a regulator when it adopted section 25. Second, because nothing in the NLRA, RLA, or ADA shows that Congress meant to preempt states or local governments from actions taken while participating in markets in a non-regulatory capacity, we conclude that section 25 is not preempted by those federal statutes. A. The City Is Acting as a Market Participant To decide whether a state or local government is acting as a market participant or instead as a regulator, we apply the two-prong test first articulated in Cardinal Towing & Auto Repair, Inc. v. City of Bedford, 180 F.3d 686 (5th Cir. 1999). See Johnson v. Rancho Santiago Cmty. Coll. Dist., 623 F.3d 1011, 1023 (9th Cir. 2010); accord, e.g., Engine Mfrs. Ass’n, 498 F.3d at 1041. First, is the challenged governmental action undertaken in pursuit of the “efficient procurement of needed goods and services,” as one might expect of a private business in the same situation? Johnson, 623 F.3d at 1023 (quoting Cardinal Towing, 180 F.3d at 693). Second, “does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than [to] address a specific proprietary problem”? Id. at 1023-24 (quoting Cardinal Towing, 180 F.3d at 693). If the answer to either question is “yes,” the governmental entity is acting as a market participant. Id. at 1024. Johnson offers an example of how this test works. There, a community college district had sold bonds to fund construction projects. Id. at 1016. As the City did here, the college adopted an agreement governing labor conditions for contractors working on those construction projects that prohibited strikes, picketing, and similar labor disruptions. Id. at 1017. The agreement also made those unions the exclusive bargaining representatives for workers on the project, required the use of union “hiring halls” for staffing, established mechanisms for resolving disputes, and required the unions to create an apprenticeship program. Id. at 1016-17. Several non-union apprentices and apprenticeship committees challenged those restrictions as preempted by the NLRA and the Employee Retirement Income Security Act (“ERISA”). Id. We held that the college was acting as a market participant under both prongs of the Cardinal Towing test. Id. at 1024-29. Specifically, we determined that the college had a proprietary interest in the efficient procurement of construction services, including in avoiding labor disruptions. This was true even though the college may have spent some of its money unwisely, and even though a private actor may not have accepted terms as unfavorable as the college had. Id. at 1025-27. We also concluded that the scope of the challenged agreement was narrow in that it applied only to construction projects worth more than $200,000 funded by the bond initiative during a certain time period. Id. at 1028-29. Accordingly, we held that the college was acting as a market participant and that the restrictions were not preempted. See id. at 1024-29. Applying that precedent here, we hold that the City satisfies both prongs of the Cardinal Towing test and so was acting as a market participant when it added section 25 to the LAX licensing contract. 1. Efficient Procurement of Goods and Services First, like the college in Johnson, the City is attempting to avoid disruption of its business: If a private entity operated LAX, that entity would have a pressing interest in avoiding strikes, picket lines, boycotts, and work stoppages. Those interests are not any less pressing simply because the City rather than a private business operates the airport, and labor peace agreements are one way to protect those interests. See Boston Harbor, 507 U.S. at 231-32, 113 S.Ct. 1190 (holding that Boston’s requiring a no-strike provision in subcontractor agreements was permissible market participation because the city was “attempting to ensure an efficient project that would be completed as quickly and effectively as possible” and because “analogous private conduct would be permitted”). Plaintiffs urge the opposite conclusion on the ground that the City has not directly participated in the market and has instead dictated contract terms to others who do. The City does, however, participate directly in a market for goods and services. “[Ajirports are commercial establishments ... [that] must provide services attractive to the marketplace.” Int’l Soc’y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 682, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (citations omitted). If the City operates the airport poorly, fewer passengers will choose to fly into and out of LAX, fewer airlines will operate from LAX, and the City’s business will suffer. It must avoid commercial pitfalls as the proprietor of a commercial enterprise. That fact makes this case distinguishable from, for example, Golden State Transit Corp. v. City of Los Angeles, 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986). In Golden State, a plaintiff taxi company alleged that Los Angeles had interfered with labor negotiations' by withholding the company’s license until a strike against the company ended. See id. at 611-12, 106 S.Ct. 1395. The plaintiff argued that Los Angeles’s license decision was preempted by the NLRA, and the Supreme Court agreed. Id. at 615-19, 106 S.Ct. 1395. The Court rejected Los Ange-les’s argument that its decision was justified by its general interest in ensuring “uninterrupted [citywide taxi] service to the public by prohibiting a strike.” Id. at 618, 106 S.Ct. 1395. Los Angeles did not operate the taxi service at issue in Golden State, nor did it use the taxi company for any city functions or services. By contrast, here, a department of the City of Los Angeles does operate LAX, and it has taken action to protect its proprietary interest in running the airport smoothly. Cf. Boston Harbor, 507 U.S. at 227, 113 S.Ct. 1190 (“[A] very different case would have been presented had the city of Los Ange-les purchased taxi services from Golden State in order to transport city employees.”). The City is thus participating in the air transportation market.[6] To the extent Plaintiffs argue more broadly that the City, as the operator of an airport, is not participating in a private market at all, we disagree. At first blush, that argument has some intuitive appeal because most airports in the United States are run by or affiliated with a governmental entity.. But the same is not true internationally. See generally, e.g., David L. Bennett, Airport Privatization After Midway, 23 Air & Space Law. 22, 22 (2010) (noting the “trend toward private participation in airport ownership and operation in most other parts of the world”); Zane O. Gresham & Brian Busey, “Do As I Say and Not As I Do”—United States Behind in Airport Privatization, 17 Air. & Space Law. 12,' 13-14 (2002) (describing airport privatization internationally and experimentation with airport privatization in the United States). And, even domestically, Congress has enacted a “pilot program” for privatization of airports. See 49 U.S.C. § 47134. Moreover, the Supreme Court and other federal appellate courts have recognized the inherently competitive and commercial nature of airport operations. See Int’l Soc’y for Krishna Consciousness, 505 U S. at 682, 112 S.Ct. 2701; see also Four T’s, Inc. v. Little Rock Mun. Airport Comm’n, 108 F.3d 909, 912-13 (8th Cir. 1997) (holding, in response to a Commerce Clause challenge, that a city that operated an airport was acting as a participant in the market for' airport rental car services). Airports also compete against private modes of transportation, like long-distance travel by' train, car, or bus. See, e.g., Randall O’Toole, Cato Inst., Pol’y Analysis No. 680, Intercity Buses: The Forgotten Mode, (2011), available at https://www. cato.org/publications/policy-analysis/ intercity-buses-fórgotten-mode (noting that intercity buses were “America’s fastest growing transportation mode” between 2007 and 2010 (citation and internal quotation marks omitted)). We therefore conclude that the City is acting as a market participant under the first prong of the Cardinal Towing test. 2. Narrow Scope The City’s actions independently qualify as market participation under Cardinal Tomng’s second prong. The decision to adopt section 25 is narrowly tied to a “specific proprietary problem,” Johnson, 623 F.3d at 1024 (quoting Cardinal Towing, 180 F.3d at 693): service disruptions at LAX, which the City manages as proprietor. Nothing in the text of section 25 or in the Complaint’s allegations suggests that section 25 will be enforced throughout the rest of the City’s jurisdiction or that section 25 will hamper service providers’ operations elsewhere. Plaintiffs argue otherwise, asserting that section 25 is in reality a preempted labor regulation because it gives labor unions a powerful bargaining chip, applies broadly to all service providers at LAX, and governs any organization that requests a labor peace agreement.[7] We find these arguments unpersuasive for reasons that become apparent in considering the three cases Plaintiffs primarily rely upon to support their position. Compared to the regulations imposed in those decisions, section 25 reaches a much narrower swath of commercial activity and focuses on specific proprietary needs. First, Plaintiffs rely on Wisconsin Department of Industry, Labor & Human Relations v. Gould Inc., 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986). In that case, the Supreme Court affirmed a decision enjoining a Wisconsin law that barred all state procurement agents from transacting with repeat NLRA violators. See id. at 283-84, 106 S.Ct. 1057. The Court held that Wisconsin’s spending policy swept too broadly to constitute a permissible exercise of market participation, particularly given the lack of an obvious proprietary concern animating the debarment scheme. Id. at 289-91, 106 S.Ct. 1057. By contrast, section 25 does not govern all of the City’s contractual relationships,[8] and the City has a clear proprietary interest in avoiding labor disruptions of airport services. Second, Plaintiffs cite Chamber of Commerce of the United States of America v. Brown, 554 U.S. 60, 128 S.Ct. 2408, 171 L.Ed.2d 264 (2008). There, the Supreme Court analyzed a preemption challenge against a California law that prohibited employers who received state funds from using those funds to “assist, promote, or deter union organizing.” Id. at 63, 128 S.Ct. 2408. The Court held that the law did not represent permissible market participation because it was “neither ‘specifically tailored to one particular job’ nor a ‘legitimate response to state procurement constraints or to local economic needs.’ ” Id. at 70, 128 S.Ct. 2408 (quoting Gould, 475 U.S. at 291, 106 S.Ct. 1057). The law’s preamble even explicitly' declared that its purpose was to prevent employers from; supporting or opposing union organization. Id. at 62-63, 128 S.Ct. 2408. The law also imposed onerous requirements for segregating funds and record keeping, and created a right of action for any private taxpayer to sue suspected violators. Id. at 72, 128 S.Ct. 2408.[9] Section 25, by comparison, is limited to addressing the needs of LAX and does not announce any sort of regulatory policy, require complicated recordkeeping, or create litigation risks. Third, Plaintiffs point to Metropolitan Milwaukee Association of Commerce v. Milwaukee County (Metropolitan Milwaukee II), 431 F.3d 277 (7th Cir. 2005). That case involved a Milwaukee County ordinance governing businesses the county had hired to provide transportation and other services to elderly and disabled residents. Id. at 277-78. Like section 25, the Milwaukee ordinance required those businesses to sign labor peace agreements, but unlike section 25, it imposed several additional conditions favorable to union organizing and did little to avoid service interruptions. See id. at 278, 281; see also Metro. Milwaukee Ass’n of Commerce v. Milwaukee County. (Metropolitan Milwaukee I), 325 F.3d 879, 880-81 (7th Cir. 2003). The Seventh Circuit held that the ordinance was preempted by the NLRA. Metropolitan Milwaukee II, 431 F.3d at 282. It rejected the county’s argument that the ordinance was proprietary, in large part because the ordinance’s impact would not be restricted to contracts with the county. See id. at 279-82. For example, the ordinance prohibited contractors from' scheduling meetings designed to discourage any of their employees from joining a union, regardless of whether those employees worked on county contracts. Id. at 280. The Seventh Circuit also reasoned that the county could have achieved its goal of avoiding service interruptions by other means, see id. at 282, and that several of the requirements it imposed focused on union organizing in particular, see id. at 278, 280-81; see also Metropolitan Milwaukee I, 325 F.3d at 880-81. Here, by contrast, there is no allegation that the purposes of Section 25 could be achieved by other means or that the licensing provision will have spillover effects .on the service providers’ operations beyond their-work for LAX. Rather, 'the nature of the businesses at issue—services performed at LAX—by definition allows for natural divisions between work for the City and work for private parties: A job is either performed at LAX or it is not, and a strike or other disruption either occurs at LAX or it does not.[10] These arguments are more specific instances of Plaintiffs’ broader allegation that section 25 cannot truly be aimed at minimizing service disruptions because it is a poor fit for that job. Under our previous decisions, evidence that an alternative strategy could more effectively or cheaply accomplish the same goals “bears only on whether [a state or local government] made a good business decision, not on whether it was pursuing regulatory, as opposed to proprietary, goals.” Johnson, 623 F.3d at 1025. Similarly, we have held that a state or local government may entertain non-economic purposes and yet rely on the market participant doctrine. See Engine Mfrs. Ass’n, 498 F.3d at 1046 (“That a state or local governmental entity may have policy goals that it seeks to further through its participation in the market does not preclude the doctrine’s application, so long as the action in question is the state’s own market participation.”). And although, as the dissent points out, the Seventh Circuit decided Metropolitan Milwaukee II partially in reliance on an obvious mismatch between the county’s asserted purpose and its means of achieving that purpose, the same court later emphasized that lurking political motives are an inevitable part of a public body’s actions and are not “a reason for invalidity.” N. Ill. Chapter of Associated Builders & Contractors, Inc. v. Lavin, 431 F.3d 1004, 1007 (7th Cir. 2005). This is not to say that a state’s supposedly proprietary actions cannot become regulatory if enacted or enforced over-broadly. Preventing such overbreadth is the purpose of the second prong of the Cardinal Towing test. See Johnson, 623 F.3d at 1023-24. Concerns about over-breadth were largely what led the Supreme Court to strike down the state-wide spending restrictions at issue in Brown and Gould. See Brown, 554 U.S. at 70-71, 128 S.Ct. 2408; Gould, 475 U.S. at 289-91, 106 S.Ct. 1057. But no state-wide restrictions—or, indeed, city-wide restrictions— are even alleged to be at issue here. The City has merely imposed a contract term on those who conduct business at LAX, which the City operates, and that contract term serves a cabined purpose.[11] We therefore conclude that the second prong of the Cardinal Towing test is satisfied, and that, in imposing section 25, the City has acted as a market participant, not as a regulator. B. The Presumption Is Not Rebutted by the NLRA, the RLA, or the ADA Having concluded that the City is acting as a market participant, we must next consider whether there is “any express or implied indication,” Engine Mfrs. Ass’n., 498 F.3d at 1042 (quoting Boston Harbor, 507 U.S. at 231, 113 S.Ct. 1190), that Congress intended the NLRA, the RLA, or the ADA to preempt actions taken by states and local governments in their capacity as market participants. Absent such an indication, the presumption that preemption applies only to regulatory conduct remains in place. See id. We begin with the NLRA. In Boston Harbor, the Supreme Court held that the NLRA does not preempt state or local government actions taken as a market participant. See 507 U.S. at 231-32, 113 S.Ct. 1190 (“In the absence of any express or implied indication by Congress that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction.”); see also id. at 227, 113 S.Ct. 1190 (“We have held consistently that the NLRA was intended to supplant state labor regulation, not all legitimate state activity that affects labor.”). Because the City is acting as a market participant here, Plaintiffs have thus not stated a claim for preemption under the NLRA. We likewise conclude that Plaintiffs have failed to state a claim for preemption under the RLA. We look .to decisions interpreting the NLRA to ascertain the RLA’s preemptive extent. See Bhd. of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 383, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969); Air Transp. Ass’n v. City & Cty. of San Francisco, 266 F.3d 1064, 1075-76 & n.4; Beers v. S. Pac. Transp. Co., 703 F.2d 425, 428 (9th Cir. 1983); see also, e.g., Hull v. Dutton, 935 F.2d 1194, 1197-99 (11th Cir. 1991); McCall v. Chesapeake & Ohio Ry. Co., 844 F.2d 294, 301-02 (6th Cir. 1988). For that reason, relying on the fact that the NLRA does not preempt market participation by state or local governments, we have stated that the RLA likewise does not preempt such conduct. See Air Transp. Ass’n, 266 F.3d at 1076 n.4 (explaining that the “RLA would not preempt actions taken by [a municipal government operating an airport] as a proprietor” (citing Dillingham Const. N.A., Inc. v. Cty. of Sonoma, 190 F.3d 1034, 1037 (9th Cir. 1999) (addressing NLRA preemption))). Finally, we reach the same conclusion about the ADA. Congress enacted the ADA to deregulate “the airline industry through ‘maximum reliance on competitive market forces and on actual and potential competition.’ ” Northwest, Inc. v. Ginsberg, — U.S. —, 134 S.Ct. 1422, 1428, 188 L.Ed.2d 538 (2014) (quoting 49 U.S.C. § 40101(a)(6)). The statuté expressly preempts states and their subdivisions from “enacting] or enforcing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier.” 49 U.S.C. § 41713(b)(1). We and the Supreme Court have interpreted the phrases “force and effect of law” or “effect of law” in preemption clauses in other statutes as applying to governmental action that is regulatory in nature and thus as not preempting market participation. See, e.g., Am. Trucking Ass’ns v. City of Los Angeles, 569 U.S. 641, 133 S.Ct. 2096, 2102-03, 186 L.Ed.2d 177 (2013) (interpreting the Federal Aviation Administration Authorization Act of 1994); Associated Gen. Contractors, 159 F.3d at 1182-83 (interpreting ERISA). Under these cases, we conclude that Congress did not intend the ADA to upset proprietary conduct like that at issue here.[12] See Am. Trucking Ass’ns, 133 S.Ct. at 2102. Plaintiffs therefore have not stated a claim under the ADA. ⅜ * * In sum, given the allegations presented in Plaintiffs’ Complaint, we conclude that the City was acting as a market participant when it added section 25 to its LAX licensing contract, and that the preemption provisions of the NLRA, the RLA, and the ADA' do not apply to state and local governmental actions taken as a market participant.[13] We therefore affirm the dismissal of Plaintiffs’ preemption claims for failure to state a claim on which relief may be granted. IV. Leave to Amend Having concluded that dismissal of the Complaint was appropriate, all that is left for us to consider is whether the district court erred by denying leave to amend. Plaintiffs have represented that remand for, the purpose of amendment would, in their view, serve no purpose. Specifically, Plaintiffs have represented that nothing has occurred in the years since section 25 took effect that would enable them to amend their Complaint to add allegations of spillover effects or other indications that section 25 operates in practice as a regulation. In light of these representations, we conclude that “the complaint" could not' be saved’ by any amendment,” Ariz. Students’Ass’n v. Ariz. Bd. of Regents, 824 F.3d 858, 871 (9th Cir. 2016). Y. Conclusion The district court’s rulings are AFFIRMED. Dissent by Judge Tallman . Because the City of Los Angeles operates LAX, we refer in this opinion to both entities collectively as "the City.” . Section 25 describes broadly the type of employee organization that can make this request and does not require the employees to be unionized. . So long as -one plaintiff has standing, an appellate court has jurisdiction to address his claims regardless of whether other plaintiffs have standing, See, e.g., Rumsfeld v. Forum for Acad. & Inst’l Rights, Inc., 547 U.S. 47, 52 n.2, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006), Given our conclusion that the ASPA has standing, we need not evaluate the Airlines’ standing, . Because this injury is sufficient to support standing, we need not consider whether the ASPA’s allegations that its members will be forced to accede to employee demands during negotiations triggered under section 25 could support standing. . The district court’s contrary decision with respect to the ASPA’s ADA claim rested largely on its conclusion that the ASPA’s members are not subject to the ADA and, thus, that it could not assert claims that rely on the ADA. ’ A plaintiff’s ability to state a claim under á particular statute is not a question of federal subject matter jurisdiction, however, but rather a question of the merits of that claim. See, e.g., Lexmark, 134 S.Ct. at 1387 n.4. . Plaintiffs relatedly argue that the City is not actually procuring any goods or services but is instead essentially offering licenses, which they describe as a “purely regulatory function.” But a private contracting condition may be proprietary even though it could also be called a licensing scheme. See, e.g., Johnson, 623 F.3d at 1017 (holding that the challenged contractual provisions in a project labor agreement were not preempted by the NLRA even though the defendant college district restricted contractors on the project to employing only members of a particular union, effectively offering a license to only one group). Nor does it matter that the City would not be a party, to the contracts that included a labor peace agreement. The chállenged municipal action in Boston Harbor also involved requiring a no-strike condition in contracts between third parties. 507 U.S. at 220-21, 113 S.Ct. 1190. That did not Stop the Supreme Court from concluding that Boston was acting as a market participant. Id. at 230-32, 113 S.Ct. 1190. . The ASPA also argues that the Service Employees International Union lobbied for section 25, demonstrating a pro-union motivation for its adoption. As discussed infra in Part IV, such motive does not matter to the preemption analysis. . The dissent suggests that section 25 may affect employment relationships outside LAX, but, as discussed further below, Plaintiffs have not alleged any such effects. . The dissent suggests that the broad- effects the Supreme Court discussed in Brown may have been discerned through discovery, but the Supreme Court’s analysis focused solely on the text of the challenged law. See 554 U.S. at 71-73, 128 S.Ct. 2408. The Supreme Court made clear that effects''the law would have were obvious on its face. See Id. Here, the text of section 25 suggests no obvious overbroad effects, and Plaintiffs have- alleged none. . We disagree with the dissent that section 25 is written so broadly as to reach the entirety of a given labor organization's membership. In context, it is clear that the provision in question, which refers to "binding and enforceable provision(s) prohibiting the Labor Organization and its members from engaging in” certain disruptive action, is meant to govern service providers at LAX. Section 25 repeatedly refers to operations at LAX, employees at LAX, and the LAX licensing program specifically. . We briefly note our disagreement with two additional arguments Plaintiffs advance. First Plaintiffs (and the dissent) argue that section 25 does not specifically address disruptions by non-union employees. That omission alone does not suggest that the City has advanced a pro-union regulatory policy rather than a proprietary interest. The LAX licensing scheme includes other protections against non-union disruptions. For example, if the airport be-Heves it is necessary to hire police or to take other steps to protect the "efficient operation of LAX” in the event of a violation of section 25 or some other legal or regulatory violation, the service providers may have to reimburse the airport regardless of what or who caused the disruption. Service providers also guarantee the quality of their work, and the City may demand the removal of a service provider’s employees or agents. Second, Plaintiffs argue that section 25 is overbroad because it applies to all operations at LAX. But LAX would hardly avoid service disruptions by requiring labor peace agreements from some service providers and not others. A contract term that applied to fewer than all of the service providers at LAX would risk disruptions attributable to whatever service providers were not required to accept section 25. . Our 'conclusion is bolstered by the inclusion of an express statutory carve-out in the ADA that preserves the ability of a governmental actor to “carry[] out its proprietary powers and rights.” 49 U.S.C. § 41713(b)(3). . In. addition to its preemption arguments, the ASPA argues that section 25 is an unconstitutional condition. But the ASPA does not explain what constitutional right has been affected. Nor have Plaintiffs appealed the dismissal of their constitutional claims.